UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
KENN ZOU *et al.*,

                     Plaintiffs,

                        -against-

XIAO HAN *et al.*,

                     Defendants.

-------------------------------------------------------------------X

**REPORT AND
<u>RECOMMENDATION</u>**

23-CV-02370 (JMA) (JMW)

**A P P E A R A N C E S:**

        Ming Hai, Esq.
        **Law Offices of Ming Hai P.C.**
        36-09 Main Street, Suite 7B
        Flushing, NY 11354
        *Attorney for Plaintiffs and Counter Defendants Kenn Zou and Chunlan Li*

        Alexander Paykin, Esq.
        **The Law Office of Alexander Paykin**
        The Empire State Building, 59th Floor
        New York, NY 10118
        *Attorney for Defendant and Counter Claimant Xiao Han*

        Mingyuan Zhang, Esq.
        Robert Hawkins, Esq.
        **The Law Office of Alexander Paykin**
        99 Tulip Ave, Ste. 408
        Floral Park, NY 11001
        *Attorneys for Defendant and Counter Claimant Xiao Han*

        Carolyn Shields, Esq.
        Ying Liu, Esq.
        **Liu & Shields LLP**
        41-60 Main Street, Suite 208A
        Flushing, NY 11355
        *Attorneys for Defendant Jun Tang*

**WICKS,** Magistrate Judge:

Plaintiffs, Kenn Zou and Chunlan Li ("Plaintiffs"), commenced this action on March 28, 2023, alleging: (i) violation of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C §1962(c), (ii) violation of RICO, 18 U.S.C. §1962(d), (iii) common law fraud, (iv) breach of contract, (v) conversion, (vi) unjust enrichment, and (vii) breach of duty against Defendants Xiao Han and Jun Tang ("Defendants"), seeking a declaratory judgment, injunction, treble damages, compensatory damages in the amount of $8,000,000, and punitive damages in the amount of $3,000,000.

On referral from the Hon. Joan M. Azrack are (1) Plaintiff's motion to amend the complaint (ECF No. 53) which seeks to add claims under §1962(a) and (b), and supplement facts with respect to all claims including newly discovered facts regarding three additional RICO predicate acts (*id*.), and (2) Defendants' cross-motions to dismiss the operative complaint for failure to state a claim, lack of subject matter jurisdiction, and to strike allegations of punitive damages and diversity jurisdiction (ECF Nos. 54 and 55).  For the reasons that follow, the undersigned recommends that both Defendant Tang's motion to dismiss (ECF No. 54) and Plaintiffs' motion to amend (ECF No. 53) be **GRANTED IN PART AND DENIED IN PART** and that Defendant Han's motion (ECF No. 55) to dismiss both the Second and Third Amended Complaints be **GRANTED** in its entirety.

**TABLE OF CONTENTS**

I.      FACTUAL BACKGROUND……………………………………………………5
        A.  The Parties and the Enterprise……………………………………………..5
        B.  Mail and Wire Frauds—Loans and Sales of Motels……………………………6
        C.  Immigration Fraud…………………………………………………….....12
        D.  Tax Fraud……………………………………………………………13
        E.  Facts Related to Fraud Claim………………………………………………16
        F.  Facts Related to Breach of Contract………………………………………16
        G.  Facts Related to Conversion Claim………………………………………17
        H.  Facts Related to Unjust Enrichment Claim…………………………………...17
        I.  Facts Related to Breach of Duty…………………………………………17
        J.  Prior Pending Actions……………………………………………………18
        K.  False Statements in E.D.N.Y. Filings……………………………………...18
II.     PROCEDURAL BACKGROUND………………………………………………20
III.    THE PARTIES' CONTENTIONS………………………………………………21
        A.  Motion to Dismiss…………………………………………………………21
            a.  Tang's Motion to Dismiss……….………………………………………21
                i.   Plaintiffs' Opposition to Tang's Motion………….…………...………………23
                ii.  Tang's Reply………………………………………………………24
            b.  Han's Motion to Dismiss………………………………………………26
                i.   Plaintiffs' Opposition to Han's Motion……………………...…………26
                ii.  Han's Reply……………………………………………………28
        B.  Motion to Amend the Second Amended Complaint…….…..…………………28
IV.     DISCUSSION…………………………………………………………………30
        A.  Motion to Dismiss…………………………………………………………30
            a.  Legal Standard……………………………………………………30
            b.  Application…………………………………………………………...31
                i.   Subject Matter Jurisdiction………………………………………31
                ii.  Standing Under Article III……………………………………32
                iii. Standing under RICO……………………………………………36
                     1.  Domestic Injury……………………………………………...37
                     2.  Injury to Business or Property………………………………38
                iv.  Conflicts of Interest and Derivative Claims…………………………39
                v.   Substantive RICO Violations………………………………...………41
                     1.  Statute of Limitation……………………………………41
                     2.  Securities Fraud Exception…………………………………44
                     3.  Merits of Claims Under Count One: 18 U.S.C. § 1962(c)…...46
                         a.  Defendants' Conduct of Racketeering Activity…..…..47
                         b.  Enterprise…………………………………………50
                         c.  Pattern of Racketeering Activity……………………54
                     4.  The Remaining RICO Claims…………………………………55
                         a.  Mail and Wire Fraud……………………………………55

     b. Money Laundering…………………………………...57
     c. Transportation of Stolen Property………………….57
    5. Han's Involvement in the Crimes……………………….58
    6. Proximate Causation and Subsequent Injury………………...59
    7. Count Two: RICO Conspiracy: 18 U.S.C. § 1962(d)………..61
   vi. State Law Claims……………………………………………63
    1. Standing for Derivative State Law Claims…………………..63
    2. Statute of Limitation for State Law Claims…………………65
    3. Count Three: Common Law Fraud…………………………66
    4. Count Four: Breach of Contract/Promises……………....…67
    5. Count Five: Conversion……………………………………...68
    6. Count Six: Unjust Enrichment………………………………69
    7. Count Seven: Breach of Fiduciary Duty……………………70
   vii. Motion to Strike……………………………………………...72
    1. Diversity Allegations………………...………………………72
    2. Punitive Damages Claims……………………………………74
  B. Motion to Amend…………………………………………………………74
   a. Legal Context……………………………………….........……74
   b. Application…………………………………………………...……76
   i. Bad Faith………………………………………….…………76
   ii. Undue Prejudice………………………………………………77
   iii. Futility……………………………………………...…………78
    1. Tolling of the Statute of Limitations…………………………78
    2. Whether Plaintiffs Cured the Deficiencies…………………..80
    3. Merits of the Newly Added Facts and Causes of Action…….82
V.  CONCLUSION…………………………………………………………85
VI.  OBJECTIONS…………………………………………………………86

## I.     FACTUAL BACKGROUND[1]

This case arises out of a series of alleged RICO acts committed by Defendant Tang and her son as well as other family members in an effort to defraud Plaintiffs and other unwitting Chinese investors through immigration, tax, and mail and wire frauds.  As a result, Plaintiffs allege they have lost over $1 million in loaned monies to the Defendants as well as a multitude of business opportunities associated with Plaintiff Zou's interest in his company.

### A.  The Parties and The Enterprise

Plaintiff, Kenn Zou aka Kang Zou, is a U.S. citizen and resident of South Carolina.  (*See* ECF. No. 33 ¶ 9.)  Plaintiff established JLK Holdings, INT, LLC ("JLK") on or about June 19, 2015, to purchase two motels, Summer Sands Motel and Carousal Motel, located in South Carolina, from ZWT LLC.  (*Id*. ¶ 44.)  At its inception, Plaintiff Zou was the 100% owner and sole founder of JLK.  (*Id*. ¶ 9.)  The second plaintiff, Chunlan Li, Kenn Zou's mother, is a citizen of China, and a lawful permanent resident of the United States with her permanent residency in Roslyn, NY.  (*Id*. ¶ 10.)  Li frequently travels between the U.S. and China attending to her businesses.  (*Id*. ¶ 10.)  Defendants include Xiao Han and Jun Tang or Judy Tang, Xiao's mother. (*Id*. ¶¶ 11, 12.)

The alleged association in fact enterprise ("organization") "launched at a date unknown to the plaintiffs, has lasted for more than 10 years and still functions up to the present day." (ECF No. 33 ¶ 13.)  The organization consists of members of Defendants' family.  (*Id*. ¶¶ 13, 112).  The members include: Audrey Tang, Defendant Han's aunt and Defendant Tang's sister, the day to day manager of the organization; Yuan Yuan aka Yuan Li, Defendant Han's cousin, and Defendant Tang's niece; Jing Jing, Defendant Tang's niece; Defendant Tang's parents in

---

[1] The facts are drawn from the Second Amended Complaint (ECF No. 33) and assumed true for purposes of the motion to dismiss.

5

China; Nan Ying, associate in China; Jia Jia, Defendant Han's sister, and Defendant Tang's daughter; Travel Home LLC, owned by Defendant Tang; and TL403 LLC, owned by Defendant Tang. (*Id*. ¶ 14.) The purpose of the enterprise was to: enrich members of the organization including Defendant Han and Tang, defraud unsuspecting investors, profit off of "immigration visa fraud," tax evasion, smuggle in family relatives from China, advertise the organizations illegal business operations domestically and internationally, "transfer large sums of funds interstate and internationally in money laundering schemes," to protect members of the organization from law enforcement; tax authorities; private lawsuits, and "to punish organization's victims who dare to fight back." (*Id*. ¶ 23.) Defendants allegedly used various methods to achieve its purpose including: aiding other members, soliciting unsuspecting wealthy Chinese nationals, using fraudulent promises to secure large investments and loans from victims with no intention of repayment, threatening victims from speaking out, using large cash transaction to avoid IRS detection and reporting rules, and using China as an intermediate money transfer for money laundering purposes. (*Id*. ¶ 24.)

### B. Mail and Wire Frauds—Loans and Sales of Motels

Beginning "some time in late 2015", Defendants allegedly began their scheme to defraud Plaintiffs and enrich the family organization. (ECF No. 33 ¶ 40.) Defendant Tang approached Plaintiff, Kenn Zou, at a Chinese community gathering in New York, offering herself as his godmother, and setting Zou up in a romantic relationship with Jing Jing. (*Id*.) At this time, Defendant Tang was a 10% owner of ZWT LLC, which owned and operated the Summer Sands Motel and the Carousal Motel. (*Id*. ¶ 41.) "Some time in the late of summer 2015," Defendants and Jing Jing persuaded Zou to purchase "all real estate assets" from ZWT LLC. (*Id*. ¶ 42.) It is alleged Defendant Tang promised to pay half of the purchase price for the real estate acquisition

Zou and Jing Jing's married.  (*Id.*)  "After a while", the two did not marry as Plaintiff Zou lost interest in Jing, prompting Defendant Tang to set him up in a romantic with Yuan Yuan, thus continuing to entrap Plaintiff Zou in Defendants' scheme.  (*Id.*)

On June 19, 2015, Plaintiff Zou, as sole Member Owner, set up JLK to purchase the real estate from ZWT and executed an Operating Agreement to govern the company's operations. (ECF No. 33 ¶ 44.)  Defendant Tang allegedly handled the entire transaction for JLK while Jun Tang's niece distracted Plaintiff Zou.  (*Id.* ¶ 45.)  "From on or about summer of 2015 to 2022" Defendant Tang allegedly promised to pay half of the purchase price for the properties and become equal partners in JLK.  (*Id.* ¶ 51.)  In addition, Defendant Tang allegedly promised Plaintiff Li that any money Li contributed to the hotel would be a loan to be paid back once the hotel began generating profits.  (*Id.* ¶ 63.)  Plaintiff Li has allegedly contributed $1,000,000.00 to the purchase without any repayment to this date.  (*Id.* ¶ 53.)  Furthermore, "from about summer of 2015 until year 2022," Defendants deliberately concealed from Plaintiffs that the purchase from ZWT also included the Carousel Motel in order for Defendants to sell the Carousel Motel without Plaintiffs' knowledge.  (*Id.* ¶ 52.)

"In or about August 2015 and till 2022, both dates being approximate and inclusive" Defendant Tang supposedly informed Plaintiff Zou and his parents in China that the Summer Sands Motel was worth over $2,000,000.00 but that JLK was able to purchase price it for $1,850,000.00.  (ECF No. 33 ¶ 46.)  Plaintiffs allege this did not occur, and the properties were actually bought for a price of $1,250,000.00.  The difference in purchase price was purportedly unknown to Plaintiffs until 2022.  (*Id.*)  "In or about August, 2015" Defendant Tang contacted Plaintiff Li by cell phone, stating that $600,000.000 of the purchase price must be paid in Chinese currency.  (*Id.*)  Relying on this, Plaintiff Li in multiple wire transfers sent "about total

$600,000.00 worth of Chinese currency" to enterprise member Nan Ying and Defendant Tang's parents in China.  (*Id.* ¶ 47.)  Subsequently, the funds were wired to Defendants "in New York, South Carolina, China and elsewhere by their relatives/agents in China." (*Id.*)  Plaintiffs allege the money was not used for the purchase of the properties but were pocketed by Defendants and the organization.  (*Id.*)  "On or about August 2015," Defendant Tang allegedly told Plaintiff Li that the seller of the motel wanted cash for the sale and made arrangements for Plaintiff Li to travel to South Carolina.  (*Id.* ¶ 48.)  "In or about late August 2015" the two parties met in South Carolina where Plaintiff Li allegedly gave $80,000.00 in cash to Defendant Tang.  (*Id.*)  Plaintiffs allege again that the money did not go towards the sale, but that Defendant Tang kept a portion of the cash for herself and transferred a portion to Defendant Han. (*Id.*)  Lastly, "in or about November 2015" Defendant Tang allegedly asked Plaintiff Li "to wire about Two Hundred Fifty Thousands of Chinese currency" to Defendant Tang's parents in China "for the benefit of Plaintiff Zou.  (*Id.* ¶ 64.)  Relying on this, Plaintiff Li wired the money to Defendant Tang's parents in China, who later rewired the "amount equivalent of US dollars" to Tang.  (*Id.*)

"Some time in the end of 2015 and early 2016," Defendant Tang allegedly "transferred 40% shares interests" in JLK, worth approximately $2,000,000.00, to Defendant Han, for free. (ECF No. 33 ¶ 51.)  Then, "in late 2019" Defendant Han allegedly "sold the 40% ownership" back to Defendant Tang for a "large sum of cash, to pretentiously legalize (Defendant) Tang's ill-gotten funds, as well as making (Defendant) Han's illegal gains as sales proceeds of corporate shares."  (*Id.*)

In 2016, Defendant Tang traveled to China to meet with Plaintiff Li at her home in Nanking City, China.  (ECF No. 33 ¶ 50.)  There, Defendant Tang allegedly asked Plaintiff Li for $10,000.00 to "promote public relations in the U.S. to benefit her son (Plaintiff) Kenn Zou."

(*Id*.)  Plaintiff Li complied with the request; however, Defendant Tang allegedly misappropriated the funds instead of using them for the stated purpose.  (*Id.* ¶ 52.)

In or about September 2016, Defendants allegedly set forth with their scheme to sell the Carousel Motel without Plaintiffs' knowledge or consent.  (ECF No. 33 ¶ 70.)  Purportedly, Defendants forged Plaintiff Zou's signature on several closing documents for the sale including a Corporate Resolution to authorize the sale.  (*Id.* ¶ 52.)  Furthermore, Defendants transmitted "forged documents including contracts, corporate resolutions …. by US Mail and Emails to purchasers, parties' attorneys, title company and others for the execution of the scheme…"  (*Id.* ¶ 70.)  Defendants supposedly completed the sale without the knowledge or consent of Plaintiffs and pocketed the entire sales proceeds of $415,000.00.  (*Id*.)

In or about June of 2018, Plaintiff Zou purportedly borrowed money from Defendant Tang for his other business ventures.  (ECF No. 33 ¶ 80.)  Plaintiffs allege Defendants used this opportunity "to force Kenn Zou to transfer 10% of his ownership interest in JLK LLC to Defendant Tang as payback for his personal debt."  (*Id*.)  On June 18, 2018, Defendant Tang supposedly wired $50,000.00 from Travel Home LLC to Plaintiff Zou's company account.  (*Id*.) In exchange, Defendant Tang acquired 10% of shares in JLK, worth approximately $400,000.00 at the time.  (*Id.* ¶ 52.)

On March 13, 2019, Plaintiffs allege Defendant Tang met with and asked Plaintiff Zou for $100,000.00 as an emergency loan for Travel Home LLC.  (ECF No. 33 ¶ 67.)  Plaintiffs additionally allege Defendant Tang knowingly made a misrepresentation to Plaintiff Zou when Tang promised to pay back the loan with profits from the Summer Sands Hotel—that is, that Defendant Tang made the promise with the intent to deliberately create business losses each year for the Motel until it was sold, thereby avoiding repayment.  On the same date, Plaintiff Zou

supposedly wired the requested $100,000.00 from First Palmetto Bank to Travel Home LLC. (*Id.*)  Plaintiffs assert, to this day, Defendant Tang still has not repaid the loan, citing the motels' lack of profits as the reason for lack of repayment.  (*Id.*).

"In or around July through September 2021," Defendants allegedly attempted to sell the Summer Sands Motel for a discounted price to Harrars Holding LLC ("Harrars") without Plaintiffs' knowledge.  (ECF No. 33 ¶ 82.)  In return, Harrars would pay Defendants on the side. (*Id.*)  To accomplish this, Defendants allegedly presented Plaintiff Zou with a purported buyer, Myrtle Beach Coastal Apartments LLC.  (*Id.*)  Defendants Tang allegedly stated to Plaintiff Zou, "the buyer will pay $1.2 million dollars cash, plus 3.55 millions in mortgage, making the sale price $4.75 millions, you should [] take it."  (*Id.*)  Defendants supposedly sent Plaintiff Zou a copy of a commercial loan approval for Mrytle Beach Coastal Apartments in the amount of $3,587,000.00.  (*Id.*)  All the while, however, Plaintiffs assert Defendants planned to secretly sell the motel to Harrars for a lower price of $3,500,000.00--$87,000 less than the price they told Zou.  (*Id.*)  To complete the plan, Defendants attempted to get Plaintiff Zou to sign a consent to sell form under the guise that the form was for the sale to Myrtle Beach Coastal Apartments. (*Id.*) However, Plaintiff Zou demanded to see the proposed contract prior to signing.  (*Id.*) In response, Defendant Tang refused to present Plaintiff Zou with the contract or any related materials to hide the scheme from Plaintiffs.  (*Id.*)  Overall, Plaintiffs assert Defendants attempted to secretly sell the motel to Harrars at a discounted price, with Harrars making side payments directly to Defendants in return.  (*Id.*)[2]

---

[2] Due to the complaint's vague and illusory language, it is unclear whether Defendants ever entered a sales contract with Harrars. Plaintiffs state, "…instead defendants entered into a contract with Harrars …" (*Id.* ¶ 83.)  Earlier however, Plaintiffs stated that Plaintiff Zou refused to sign the consent to sell form. (*Id.*) Subsequently, Plaintiffs never state if or how the Defendants obtained Plaintiff Zou signature for the consent to sell form.  (*Id.*)

Plaintiffs assert Defendants purchased real estate in the name of TL403 LLC using "ill-gotten" money with the plan to resell them in order to "turn illegal money into legal real property sales proceeds." (ECF No. 33 ¶ 79.)  On November 3, 2014, Defendant Tang in the name of TL403 LLC bought a home in North Carolina for $260,000. (*Id*.)  "On or about September 28, 2021" Defendants contracted with Harrars to sell the home for $700,000.00, approximately three times the market value. (*Id*.)  A professional real estate firm estimated the fair market value of the home was about $296,300.00. (*Id*.)  Through the sale, Plaintiffs allege Defendants "transformed the monetary proceeds derived from illegal activities into funds with an apparent legal source." (*Id*.)

On April 25, 2023, Defendant Tang allegedly met with and intentionally made several misrepresentations to Plaintiff Li at Qing Dao restaurant in Flushing, NY to "explain away the necessary frauds committed by [Defendants]." (ECF No. 33 ¶¶ 48, 60, 65, 71.)  First, Defendant Tang allegedly stated the $80,000.00 cash Plaintiff Li gave to Defendant Tang in 2015 was given to a Mr. Wang. (*Id*. ¶ 49.)  Plaintiffs assert this statement was false, and Defendant Tang kept the money for herself and the family enterprise. (*Id*.)  Next, Defendant Tang allegedly stated the Carousal Motel was not a part of the purchase made by JLK from ZWT; rather, Tang claimed the motel was owned by herself and her family. (*Id*. ¶ 71.)  Plaintiffs assert Defendant Tang knowingly made this misrepresentation to Plaintiff Li to conceal the profits Tang made from the sale of the Motel back in 2016. (*Id*.)  Furthermore, Plaintiffs assert, at this meeting, Tang "admitted that the discounted sales price of Summer Sands Motel arranged by her was to evade the capital gain taxes and property transfer taxes." (*Id*.)  Lastly, Plaintiffs assert, at this meeting, Defendant Tang threatened and blackmailed Plaintiff Li. (*Id*. ¶ 65.)  More specifically, Defendant Tang allegedly stated she would deny any claim that she took "$600,000 worth of

Chinese currency RMB from plaintiff Chunlan Li" and that "the Chinese evidence of wiring said funds in China" would be inadmissible in court. (*Id.*) Plaintiffs assert Defendant Tang made these comments to "deter plaintiffs from exercising their legal rights and reclaim their lost funds."

## C. Immigration Fraud

Plaintiffs allege beginning around "August 18, 2016 continuing on till present day," Defendants created and implemented a fraudulent scheme offering to sell green cards to Chinese investors and their families through the US EB-5 program. (ECF No. 33 ¶ 87.) Defendants allegedly solicited green cards to Chinese nationals in exchange for the purchase a US-based apartment from Defendants for a price of $500,000.00. (*Id.*) Plaintiffs allege that Defendants did not own such apartments, and that Defendants could not legally secure legitimate green cards through the EB-5 program as Defendants' offer did not meet the eligibility requirement for the immigration program. (*Id.*) Furthermore, Plaintiffs allege Defendants created fake brochures displaying photos of luxury apartments, hotels, and restaurants to promote the scheme and entice investors. (*Id.*) In addition, Defendants allegedly traveled to China "several times in following years" to solicit the fraudulent scheme to Chinese nationals. (*Id.*) On, August 18, 2016, Defendant Tang allegedly stated on WeChat, "I am making investment green card brochures, busy like crazy and will go back to China to propaganda to get client." Additionally, Defendant Tang allegedly admitted over WeChat that the brochures were fake. (*Id.*)

Plaintiffs allege, on an unknown date, that Defendant Tang through fraudulent means secured Jing Jing's, Jun Tang's niece, entrance into the U.S. by pretending to be Jing Jing's mother. (ECF No. 33 ¶ 85). As a result, Plaintiffs allege Jing Jing was able to obtain U.S. Citizenship in New York through immigration fraud. (*Id.*) Jing Jing's mother allegedly has been

banned from entering the U.S. by the U.S. Department of State for her connection to the enforcement of China's birth control policy. (*Id.*)

Plaintiffs allege, on an unknown date, Defendants used the Summer Sands Motel to forge immigration documents and successfully obtain an L-1 Visa for a friend's fiancé, posing the fiancé as a high-level company executive in exchange for a fee of nearly $250,000. (ECF No. 33 ¶ 86.) The fee was allegedly paid in China to avoid detection of U.S. authorities. (*Id.*)

Plaintiffs allege, on "an exact date unknown," Defendant Tang and Jing knowingly answered falsely to multiple questions on a N-400 US Immigration form and submitted the inaccurate form to obtain citizenship in the United States. (ECF No. 33 ¶¶ 88, 89.)

#### D. Tax Fraud

Plaintiffs claim Defendants have concealed "all books, records, tax documents, [and] tax returns" for JLK up until February 2023, when Defendants provided partial tax returns from 2015 to 2021. (ECF No. 33 ¶ 54.) Plaintiffs state these tax returns were prepared by accountants hired by Defendants. (*Id.*) Upon receipt of the tax returns, Plaintiffs allegedly discovered Defendants filed fraudulent tax returns for JLK each year, in 2016 through 2022, with the intent to defraud Plaintiffs, keep all cash revenue, and avoid loan repayment. (ECF No. 33 ¶¶ 54, 56.) More specifically, Defendants allegedly claimed enlarged and fake expenses on JLK's taxes each year including but not limited to management fees, maintenance costs, materials costs, supply costs, and utilities expenses. (*Id.* ¶ 54.) Consequently, this allowed Defendants to show a net operational loss for JLK in each tax year, thus avoiding loan repayments to Plaintiffs. (*Id.* ¶¶ 54, 56.)

Defendants repeatedly reported "management fees" paid to Defendant Tang's company, TL403 LLC. (ECF No. 33 ¶¶ 68-69, 72-76.) In the 2016 tax year, Plaintiffs allege the claimed

$200,000.00 loan payment was made to Defendant Tang's company Travelhome LLC for a "non-existent loan." (*Id.* ¶ 69.) In addition, Plaintiffs state Defendant Tang admitted the claimed repairs in 2016 never occurred. (*Id.*) Plaintiffs note in the 2016 tax year, "the actual commission was only $24,900.00 and was already deducted from her reported sale proceeds on the tax return … [Defendants] deducted the commission twice and the second commission reported was made up and doubled the sum of the actual commission paid." (*Id.*) Plaintiffs allege Defendants concealed the detailed deductions from the tax return and denied Plaintiffs' request for this information. (*Id.* ¶ 74.) In the 2021 tax return, Defendants allegedly claimed a "legal fee" of $42,467 however, Plaintiffs state such fee was not the obligation of JLK but a personal obligation of Defendants. (*Id.*) In the 2022 tax year, Plaintiffs assert Defendants concealed "their forged deductions and business records from being discovered." (*Id.* ¶ 77.) Furthermore, Plaintiffs allege, in each tax year, Defendants used "US Mails and Email" to perpetuate the fraud and send forged documents to "[Defendants'] accountants and further to the IRS." (*Id.* ¶¶ 68-69, 72-76.)

On an unspecified date, Plaintiffs claim the 86-room motel was converted into a rental apartment complex. (ECF No. 33 ¶ 57.) Plaintiffs allege the room rental rates were $1,000 per month in the winter, and $1,200.00 or $1,250.00 a month in the summer. (*Id.*) On February 15, 2023, a licensed private investigator, Mr. Robert Mason, allegedly spoke with Audrey Tang who stated the hotel only accepted cash payments. (*Id.* ¶ 58.) On June 23, 2023, the investigator allegedly revisited the hotel and learned Defendants recently started accepting credit card payments. (*Id.*) In addition to the tax fraud, Plaintiffs allege Defendants annually misappropriated an estimated "half million-dollar cash incomes, assuming the motel converted apartment building only had 50% occupancy throughout the year." (*Id.* ¶¶ 68-69, 72-76.)

On July 3, 2023, Plaintiffs state Defendant Tang informed the investigator the hotel was at full occupancy for the month of July.  (ECF No. 33 ¶ 58.)  Based on this information, Plaintiffs assert Defendants' rental income for the month of July 2023 alone would total $103,000.00.  (*Id.* ¶ 59.)  In addition, Plaintiffs state, during the summer season, the motel was at full occupancy.  (*Id.*)  Plaintiffs allege that even at 50% occupancy year-round, the hotel would likely still have "more than half million dollars net profits each year."  (*Id.*)

Below is a summary of Defendants' misrepresentations on the tax returns beginning in 2015 and ending in 2021:

| Year | Falsely Reported Deductions | Business Operation Loss | Misappropriated Funds[3] |
|---|---|---|---|
| **2015** | $156,507.00<br>• $59,180.00 (Management Fees)<br>• $18,007.00 (Supplies / Utility Fees) | $93,435.00 | $77,187.00 |
| **2016** | $522,527.00<br>• $109,189 (Management Fees)<br>• $118,007 (Supplies)<br>• $127,606 (Repairs)<br>• $200,000 (Loan Repayment)<br>• $40,000 (Commission Payment) | $34,457.00 | $594,802.00 |
| **2017** | $468,955<br>• $47,965 (Management Fees)<br>• $118,007 (Supplies / Utility Fees)<br>• $33,275 (Commission Payment) | $280,988 | $199,697.00 |

---

[3] The amounts in the column are an estimate by Plaintiffs assuming the Summer Sands Motel operated at 50% occupancy for the year.

| 2018 | $419,308<br>• $61,680 (Management Fees)<br>• $48,107 (Supplies)<br>• $119,346 (Utilities)<br>• $117,648 (Materials) | $178,148 | $306,781.00 |
| 2019 | $384,515 | $132,515 | N/A |
| 2020 | $353,047<br>• $59,180 (Management Fees)<br>• $23,007 (Supplies)<br>• $163,346 (Utilities) | $137,029 | $205,533.00 |
| 2021 | $286,564<br>• $79,270 (Management Fees)<br>• $27,722 (Landscaping)<br>• $32,467 (Legal Fees) | $34,510 | $139,459.00 |

### E. Facts Related to Fraud Claim

As to common law fraud, Plaintiffs restate the prior allegations as mentioned above—specifically that Defendants defrauded Li in promising to repay the loans; defrauding Zou by promising to invest 50% of the Summer Sands sales price, and selling the Carousel Motel without Zou's consent.  (ECF No. 33 ¶ 126.)

### F. Facts Related to Breach of Contract

As to Plaintiff's breach of contract claim, Plaintiffs only state in a conclusory manner, that Defendants "breached the Operating Agreement" by excluding Plaintiff Zou from the managing position of JLK contrary to the terms of the agreement, by failing to provide records of cash incomes failing to pay dividends, by usurping and diverting JLK's business income to pay personal expenses and, by stealing from JLK on a systematical basis.  (ECF. No. 33 ¶ 134.)

### G. Facts Related to Conversion Claim

As to Plaintiffs' conversion claim, Plaintiffs merely state that Defendants have "systematically looted and taken home cash incomes from JLK Holdings INT LLC on daily and/or monthly basis." (ECF. No. 33 ¶ 138.) Similarly, Plaintiffs also state "Defendants withheld, took, stole, and converted incomes that belong to the plaintiffs." (*Id*. ¶ 142.)

### H. Facts Related to Unjust Enrichment Claim

As to Plaintiffs' unjust enrichment claim, Plaintiffs state in a conclusory manner, that Defendants have "withheld, took, stole, converted incomes that belongs to the plaintiffs and still are in possession of properties that belongs to the plaintiffs, have been unjustly enriched at the expenses of the plaintiffs." (ECF No. 33 ¶ 150.)

### I. Facts Related to Breach of Duty

Finally, regarding Plaintiffs' breach of duty claims, Plaintiffs only state that Defendants "owed a fiduciary duty to Plaintiffs to discharge their duties and exercise rights related to JLK Holding INC LLC consistently with the obligation of good faith and fair dealing…" (*See* ECF. No. 33 ¶ 134.) Plaintiffs allege Defendants breached such duty owed to Plaintiffs by failing to "account for the sales proceeds from the sale of the Carousel Motel…", by acting "on behalf of ZWT, LLC in collection of the Promissory Note…", and by owning and operating "competing Motels/Rental properties in Myrtle Beach South Carolina area and diverting funds that belong to plaintiffs to their competing business." (*See* ECF. No. 33 ¶¶ 162-164.)

In addition, Plaintiffs state Defendants owed and breached a "duty of loyalty to Plaintiffs" by failing to properly act as a trustee for the company, competing with the company's business, and "dealing with Company … on behalf of a party" with an adverse interest "to the Company's." (*See id*. ¶ 167.)

**J.  Prior Pending Actions**

Plaintiffs claim Defendant Tang and Jia Jia, Tang's daughter, were sued for "conspiracy and fraud among other causes of actions", by Chinese investors and brothers Gengwu Qiu and Geng Min Qui ("Qiu brothers") "in or about July 2013." (ECF No. 33 ¶ 91.)  Plaintiffs allege Defendants through a similar scheme as the one used against Plaintiffs, defrauded the Qui Brothers. (*Id*.)  Defendants allegedly purchased a hotel through an LLC owned by the Qiu brothers. (*Id*.)  Furthermore, Defendants allegedly misappropriated $350,000.00 by telling Plaintiffs the hotel was purchased for $1,300,000.00 when the hotel was actually purchased for $950,000.00. (*Id*.)  In addition, Plaintiffs allege Defendants "managed and controlled the hotel to the exclusion of [the Qiu brothers] …, and [used] hotel funds to pay for personal debts and expenses." (*Id*.).

"In or about April 2016, Mr. Patrick Wilkinson, Pro Shop owner and a manager of Black Bear Golf Course in South Carolina" allegedly sued Defendant Tang for "fraud, constructive fraud and conversion among other cause[s] of action." (ECF No. 33 ¶ 92.)  Defendant Tang allegedly failed to pay employee salaries, made misrepresentations of fact, and stole property belong to Mr. Wilkinson. (*Id*.)

**K.  False statements in E.D.N.Y. filings**

Plaintiffs allege on June 12, 2023, Defendant Tang knowingly submitted a "Declaration under oath" to the U.S. District Court for the Eastern District of New York that contained multiple "false statements of fact." (ECF No. 33 ¶ 93.)  *First*, Defendant Tang allegedly claimed there was a prior pending action in South Carolina involving claims in common with the claims made here by Plaintiffs. (*Id*.)  Plaintiffs claim this was a false statement, as the action mentioned by Defendant Tang was dismissed without prejudice by consent of the parties involved. (*Id*.)

18

*Second*, Defendant Tang allegedly claimed she had no connection to a Hicksville apartment. (*Id.* ¶ 94.) Plaintiffs claim this is false as Defendant Tang has allegedly used the address to file taxes and to open/maintain bank accounts at Bank of America and Chase. (*Id.*) *Third*, Defendants allegedly "misrepresented facts to the court that she has been a resident of South Carolina since 2009." (*Id.*) Plaintiffs claim this is false as Defendant Tang allegedly has a New York license and has filed taxes as a New York resident from 2015 until 2023. (*Id.*) Furthermore, Plaintiffs claim Defendant Tang made this specific misrepresentation to have the current action dismissed for lack of personal jurisdiction. (*Id.*) *Fourth*, Defendant Tang allegedly claimed, "that Plaintiff Li's napkins on the restaurant table was the summons and complaint in this instant action." (*Id.* ¶ 95.) Plaintiffs claim Tang attempted to "mislead the court to believe that Plaintiff Li served her the napkins as the summons and complaint" to destroy the validity of service. (*Id.* ¶ 91.) Overall, Plaintiffs allege Tang knowingly made these misrepresentations under oath to "undermine the ability of the courts to obtain truthful testimony and to effectively administer justice." (*Id.* ¶ 93.)

On June 14, 2023 Plaintiffs allege Defendant Tang knowingly submitted another false "declaration under oath, reversing her story by stating she did not have knowledge" the prior pending action in South Carolina was dismissed, and insisting that her attorney in South Carolina, Mr. Gene Connell, did not inform her the stipulation of dismal had been filed. (ECF No. 33 ¶ 93.) Plaintiffs claim Defendant Tang's statement regarding her attorney was false, and that the stipulation of dismissal was public information. (*Id.*)

On July 6, 2023 Plaintiffs allege Defendant Tang knowingly made misrepresentations "to this court in another submission (ECF No. 25)." (ECF No. 33 ¶ 96.) In the submission, Defendant Tang allegedly cited, "case number 2022CCP2600007", a prior pending action, as

19

grounds for dismissal of Plaintiffs instant action.  (*Id.* ¶ 93.)  Plaintiffs claim the cited case involved a single breach of contract claim by Harrar Holdings against Zou and Tang as separate defendants with no counter claims or cross claims.  (*Id.* ¶ 96.)  Plaintiffs allege "the truth was known to the defendant as defendant is a party in that action and the pleadings are public information online. The misleading statement and intentional concealment of the pleadings were intended to undermine the ability of the court to obtain truthful testimony and effectively administer justice." (*Id.*)

## II.    <u>PROCEDURAL BACKGROUND</u>

Plaintiffs filed the original complaint on March 28, 2023.  (ECF No. 1.)  Just a few months later, Plaintiffs filed their first amended complaint on July 3, 2023.  (ECF No. 23.)  The undersigned held an initial conference with the parties on July 7, 2023 (ECF No. 26), at which the Court set a discovery schedule (ECF No. 27).  Since then, the parties have filed a multitude of discovery motions.  (*See e.g.* ECF Nos. 45, 51, 61-62, 76, 84, and 88.)  After extending the discovery deadlines a few times (Electronic Order dated Jan. 5, 2024; ECF No. 79), the Court granted Plaintiffs' request for an extension of the schedule noting that these dates and deadlines were final with fact discovery to conclude on September 27, 2024 and expert discovery to close on January 31, 2025.  (Electronic Order dated June 18, 2024.)

On July 6, 2023, Defendant Tang filed a pre-motion letter regarding her anticipated motion to dismiss (ECF No. 25) and Plaintiffs opposed (ECF No. 28).  Judge Azrack however, allowed Plaintiffs to file *a second* amended complaint ("SAC") (Electronic Order dated Aug. 24, 2023) and Plaintiffs did (ECF No. 33).  Defendant Han filed an answer to the SAC (ECF No. 35), but to date Defendant Tang has not filed an answer.

Defendant Tang instead again filed a pre-motion letter regarding her anticipated motion to dismiss the SAC (ECF No. 36), with Plaintiffs opposing shortly after (ECF No. 37).  The pre-motion letter and subsequent motion to dismiss were referred to the undersigned for a Report and Recommendation.  (Electronic Order dated Oct. 27, 2023.)

On November 9, 2023, Plaintiffs filed a letter motion to amend the SAC (ECF No. 40). However, the undersigned denied Plaintiffs' letter motion to amend (Electronic Order dated Nov. 10, 2023) and instead set a pre-motion conference to discuss the parties' motions.  At the pre-motion conference, the Court set a briefing schedule for the parties to file their respective motions.  (ECF No. 44.)  All parties finally filed their respective motions to dismiss and to amend on February 5, 2024.  (ECF Nos. 53-55.)

### III.    THE PARTIES' CONTENTIONS

**A.    Motion to Dismiss**
      **a.  Tang's Motion to Dismiss**

Defendant Tang *first* alleges that the case should be dismissed for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), that the operative complaint fails to allege Article III and standing sufficient for RICO claims, including pleading causation and redressability, given that several of their claims apply to nonparties.  (ECF No. 54-1 at 11-15, 38-39.)  Plaintiffs suffered no injury to their business or property especially given that the allegedly fraudulent tax returns would damages the IRS and that one of the properties in question (the Summer Sands Motel) is currently involved in a stalled sale, so damages are not yet definite.  (*Id*. at 11-15, 27-28.)  Relatedly, Tang alleges that Plaintiffs have not provided any support for a domestic injury suffered by Plaintiff Li—namely, simply transferring monies to and from Chinese banks does not constitute a domestic injury.  (*Id*. at 39-40.)

*Secondly*, Defendant Tang alleges there are a multitude of conflicts between Plaintiff Zou and JLK as well as Plaintiffs' counsel and his clients. (ECF No. 54-1 at 15.) This is because Zou asserts both individual and derivative claims and cannot fairly represent JLK as required under Fed. R. Civ. P. 23.1. (*Id*. at 15-16.) Further, he has sued JLK in a previous action in South Carolina. (*Id*. at 16-17.) As to Plaintiffs' attorney, he has failed to include the LLC as a necessary party and failed to bring certain claims against the LLC, including claims for dividends or distributions or repayment of a loan, an inspection of the books and records, an improper sale of the LLC's real property. (*Id*. at 12, 17-20.) Since both Plaintiffs have claims against JLK, a party that is named only derivatively in this case, counsel is thus representing parties with claims adverse to one another. (*Id*. at 20-21.)

*Next*, Tang argues that Plaintiff's claims fall within the "securities fraud exception" to the civil RICO statute which was supposedly intended to eliminate securities fraud as a RICO predicate act. (ECF No. 54-1 at 21-27.) This is because Plaintiffs make a slew of allegations that relate to the purchase and sale of JLK LLC's membership interests and that Defendants used company funds or funds otherwise belonging to Plaintiffs to buy personal items. (*Id*.) As to the substantive RICO claims, Defendant Tang contends that the operative complaint fails to sufficiently allege racketeering acts under the RICO statute and conspiracy, mail and wire fraud in accordance with Fed. R. Civ. P. 9(b), a RICO pattern, including relatedness and continuity, and a RICO enterprise. (*Id*. at 30-38, 41.) Tang also states that the claims are time-barred according to the applicable RICO statute of limitations because Plaintiffs could have discovered the alleged frauds years before they filed the Complaint. (*Id*. at 41-44.)

*Finally*, she alleges that two statements should be stricken from the SAC: (1) the diversity of citizenship allegations given that (a) Zou and Tang are from South Carolina; (b) Li

and Han are from New York; and (c) the members of JLK LLC (Zou, Tang, and Han) are on both sides of the case; and (2) the allegations for punitive damages for the RICO claims since such damages are not an available remedy under the statute.  (ECF No. 54-1 at 45-46.)

### i. Plaintiffs' Opposition to Tang's Motion

Plaintiffs argue that there is Article III standing and the Court does indeed have subject matter jurisdiction over this matter given the RICO claims asserted.  (ECF No. 56 at 7-8.)  For example, Plaintiffs were indeed harmed by Defendants' actions—they underreported the hotels' incomes and success to avoid paying Plaintiffs their owed sums.  (*Id*. at 7-8.)  Plaintiffs do not seek redressability for monies owed to these investors or to the Internal Revenue Service for the alleged tax fraud or to the defrauded innocent investors in the alleged immigration fraud; rather, they'd like *Plaintiffs'* harm to be redressed.  (*Id*. at 9.)  As to Plaintiff's Zou's standing, Plaintiffs state Zou has sustained injury to his business and property both as an individual and as an investor/shareholder in JLK due to Defendants' theft and conduct.  (*Id*. at 9-12.)  Similarly, Plaintiff Li suffered from Defendant Tang's misconduct concerning the nonpayment of loans worth $1.04 million.  (*Id*. at 10-11.)  They can therefore bring these claims against Defendants on JLK's behalf and on their own.

Further Tang's motion is defective and meritless because it includes extraneous materials which should be treated as a motion for summary judgment and not as a motion for dismiss and Plaintiffs have sufficiently pled all RICO elements in light of all Defendants' misconduct.  (ECF No. 56 at 14-21, 25-26.)  As to the securities fraud exception, Plaintiffs claim it is not applicable because this case concerns only a real estate transaction, *not* a security sale.  (*Id*. at 21-25.)  Defendants sought to acquire JLK and use the monies for their personal use which affected

interstate or foreign income. (*Id*. at 22-23.) Moreover, JLK is not a corporation that issues shares or securities and the members (Zou and Defendants) are considered partners. (*Id*. at 23.)

Plaintiffs next assert that there are no conflicts of interests between JLK and the Plaintiffs or counsel and Plaintiffs. (ECF No. 56 at 12.) Plaintiff Zou was still the 100% owner of JLK and suffered separate injuries from the entity and *Defendants*, *not* JLK, breached their duty to Zou. (*Id*.) Further, Plaintiffs have never intentionally sued JLK; in fact, the South Carolina suit listing Tang and JLK as Defendants, was intended to solely be a shareholder derivative suit. (*Id*. at 13.) In contrast, here, the suit is being brought by Zou in a derivative capacity to redress harms caused by Tang. (*Id*. at 12-13.) The South Carolina action has since been discontinued to avoid confusion. (*Id*. at 13.) Plaintiffs' counsel also avers that he has never had contact with JLK or either Defendant in this case. (*Id*. at 27.)

Finally, Plaintiffs state other miscellaneous arguments toward the end of their opposition: that Defendant Tang pled the Fifth Amendment when answering an interrogatory which demonstrates she has committed crimes for which she was not arrested (ECF No. 56 at 29-30); Defendant Tang's motions to strike is now moot given that the Third Amended Complaint does not ask for punitive damages and diversity of citizenship is merely an alternative legal theory (*id*. at 30); and Defendant Tang's failure to attach a copy of the pleadings with her motion to dismiss serves as a ground for denial (*id*. at 30).

### ii. Tang's Reply

Tang opens the reply by stating that she "did not move to dismiss the proposed Third Amended Complaint because leave to file it has not been granted and the Court's clarification order of January 5, 2024 did not permit it."[4] (ECF No. 58 at 6.) Thus, the reply "only relates to

---

[4] But Tang should have included any arguments opposing the motion to amend. Indeed, the undersigned's January 5, 2024 Order stated as follows:

Defendant's motion to dismiss the SAC." (*Id*. at 7.) Relatedly, Defendant Tang says Plaintiffs "may not oppose the deficiencies in their SAC by referring to the [Third Amended Complaint], which they have not been given leave to file." (*Id*.)

Tang lodges the same substantive arguments against Plaintiffs in her reply. (ECF No. 58.) However, Tang additionally argues that Plaintiffs make false statements in their opposition brief and that Plaintiffs' counsel's quoting statements made by Defendant Tang are inadmissible hearsay not provided during discovery but rather is a recording by Plaintiffs which does not say what they say it says. (*Id*. at 8, 23.) As to the false statements, Tang alleges she did not state in any document that she kept JLK proceeds, nor did she plead the Fifth Amendment—rather, she stated she "is not waiving her privilege against self-incrimination under federal or state law should this interrogatory be ruled proper or that she is required to answer it." (*Id*. at 12.)

Further, Tang states that Defendants' declarations and exhibits to their motion and opposition are proper and all of the statements relate in some manner to Plaintiffs' allegations in the complaints. (ECF No. 58 at 17.) Some of these documents also relate to the question of whether the Court has jurisdiction which allows the Court to consider this extrinsic evidence. (*Id*. at 20.) Finally, as to the defects, Defendant cites case law stating that they need not attach the complaints when the exhibits are already "voluminous." (*Id*. at 23.)

---

Defendant is to submit a combined motion consisting of the motion to dismiss the operative complaint and *the opposition to Plaintiff's motion to amend the proposed complaint*. *See* ECF No. 44 . Defendant Tang shall file an opening memorandum of no more than fifty (50) pages and a reply memorandum of no more than twenty-five (25) pages.

(Electronic Order dated Jan. 5, 2024) (emphasis added).

### b. Han's Motion to Dismiss

Similar to Defendant Tang, Defendant Han alleges two grounds for Plaintiffs' complaints to be dismissed: (1) lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and (2) failure to state a claim under Fed. R. Civ. P. 12(b)(6). (ECF No. 55.)

*First* Han claims that complete diversity does not exist between Tang and Zou as both are residents of South Carolina. (ECF No. 55 at 11.) Further, according to Han, he was only added as a Defendant to obtain that diversity between the parties even despite his lack of involvement. (*Id*.)

*Second*, as to the failure to state a claim under Rule 12(b)(6), Han states that he never engaged in the racketeering activities alleged and thus all claims pursuant to 18 U.S.C. §§ 1962 (c)—(d) fail. (ECF No. 55 at 14-17.) For example, Plaintiffs have not provided proof that Han knew that the funds used to buy the cars were stolen or that Tang stated the business was profitable. Further, Han's state law claims for common law fraud, breach of contract/promises, conversion, unjust enrichment, breach of duty, and declaratory judgment and injunction also fail. (*Id*.) Plaintiffs have not pled these claims with the required particularity and have not alleged Han's involvement in the alleged schemes. (*Id*. at 19-26.) Further, Plaintiffs have not shown that they are likely to be wronged again in the future by Han. (*Id*. at 26.)

### i. Plaintiffs' Opposition to Han's Motion

Plaintiffs first argue that Judge Azrack only referred Defendant Tang's motion to dismiss for a Report and Recommendation and not Han's. (ECF No. 57 at 5.) Relatedly, he did not submit a pre-motion letter before filing his motion, which violates this Court's individual rules. (*Id*. at 6.) As to discovery, Plaintiffs allege that Han has declined to answer requests for

production and interrogatories, contributing to the idea that Han is concealing information intentionally. (*Id*. at 22.)

Plaintiffs next state that subject matter jurisdiction exists over these claims because this case is brought under the RICO statute. (ECF No. 57 at 5.) Therefore, diversity of citizenship is just a "secondary, alternative legal theory." (*Id*. 5-6.) Plaintiffs also allege that Han's inclusion of extraneous material shall not be considered on a motion to dismiss; rather if the court chooses to include it, the motion would be converted to a motion for summary judgment pursuant to Fed. R. Civ. P. 56. (*Id*. at 6.) They also argue that because Han already interposed his Answer, he cannot now file a motion to dismiss under Fed. R. Civ. P. 12(b). (*Id*.)

As to the merits of the operative and proposed complaints, Plaintiffs state that Han had direct involvement in the racketeering activities since he acquired ownership of JLK without consideration, colluded with Tang in misrepresenting that the hotel business was not profiting, retained and used the brand new car obtained with stolen monies, and received funds or benefits directly from Plaintiffs as a result of his mother's control of JLK. (ECF No. 57 at 8-9, 20-21.) Plaintiffs allege that Han's conduct constitutes mail and wire fraud. (*Id*. at 12.) They additionally allege that Han's counsel engaged in coercion and violated the Hobbs Act in attempting to force counsel to discuss damages. (*Id*. at 12-13.)

Finally, as to Plaintiffs state common law claims, he states that none of the language in either the operative or proposed complaints have been amended. (ECF No. 57 at 22.) And, in any event, Han has answered the SAC, which forecloses and waives his right to move to dismiss that portion of the SAC now. (*Id*.)

### ii. Han's Reply

In his reply, Defendant Han largely repeats the same arguments as set forth in his motion (ECF No. 55) and additionally argues that Plaintiffs cite to non-binding, inapplicable case law and statutes and have abandoned the state law claims since they only defend their RICO claims. (ECF No. 60 at 7, 13.)  He states that Plaintiffs' abandonment of these issues amounts to a concession that the claims lack merit.  (*Id.*)

With regard to his failure to follow rules, Han states he adhered to the page limitations for his motion and has complied with all discovery requests and obligations thus far.  (*Id.* at 14.)

### B.    Motion to Amend the Second Amended Complaint

Plaintiffs contend that they should be given leave to amend a third time given the case's complexity in a RICO such as this one and that "highly relevant new facts developed and came to light."[5]  (ECF No. 53-1 at 7.)  Those new facts, which constitute separate predicate acts, include:

- Around October 22, 2020, Defendant Tang conspired with Han by using stolen funds from Plaintiff Li and JLK to purchase a new Cadillac across state lines.  (*Id.* at 8-9.)  Similarly, Tang also bought a Volkswagen with stolen funds despite claiming that the hotel was losing business.  (*Id.* at 9.)  Finally, Tang purchased a mini-Cooper with stolen funds.  (*Id.*)

- Around December 1, 2023, Tang conspired with Han engaged in mail and wire fraud by transferring fraudulent documents to Plaintiffs in order to steal money and/or property from them—namely, to sell Summer Sands at a discounted price to Harrars so Defendants could receive kickbacks from Harrars.  (*Id.* at 9-11.)  This property was to be sold at an auction.  (*Id.* at 11.)  To prevent it from being sold and because Defendant Tang failed to pay her half as she said she would, Plaintiffs put in 100% of the taxes due and owing.  (*Id.* at 11-12.)

---

[5] Plaintiffs also state that they should be permitted to file an amended pleading since Defendant Tang has not served a responsive pleading at this juncture. (ECF No. 53-1 at 6.)  This point is moot however given that Defendant Tang filed a pre-motion letter to dismiss the Complaint on October 7, 2023.  (ECF No. 36.)

- Around June 2016, Defendants and Tang's sister conspired to profit from investment green card programs by requiring investors abroad to invest $500,000 to $1 million in U.S. businesses. (*Id*. at 13.) However, these businesses did not exist. (*Id*. at 14.)

Plaintiffs state that the newly proposed Third Amended Complaint answers all challenges that Defendants raised in the prior pre-motion letter and pleads all applicable claims with particularity as required by Fed. R. Civ. P. 9(b). (ECF No. 53-1 at 7-8.) Plaintiffs also maintain that records demonstrate that Defendants stole monies from Plaintiffs and engaged in various racketeering activities. (*Id*. at 14-15.) They state this shows no undue delay, bad faith, dilatory motive, or undue prejudice. (*Id*. at 15.)

Defendants oppose stating that Plaintiffs' motion to amend the Complaint is futile because they fail to state a claim. (ECF Nos. 54-1 and 55.) Defendant Tang states that Plaintiffs have repeatedly failed to correct the deficiencies in their prior complaints and the newly proposed complaint involves the *same* shortcomings, including providing factual support to support the RICO claims. (ECF No. 54-1 at 48-53.) Tang also maintains that she would be "seriously prejudiced by Plaintiffs' bad faith allegations in the proposed TAC." (*Id*. at 53-54.) She would be prejudiced because Plaintiff Zou's assignment of 10% of JLK's membership interest to Tang was a sale, not a loan, which is supported by Defendants documentation. (*Id*. at 53.) She also states it would be significantly difficult for her to locate the documents dating back to 2015 to defend the claims Plaintiffs now bring. (*Id*.)

Similar to his motion to dismiss, Defendant Han argues that he never engaged in the alleged racketeering activities, consequently, Plaintiffs' claims under 18 U.S.C. §§ 1962 (a)—(b) fail. (ECF No. 55 at 12.) Han also contends that Tang's prior pre-motion letter seeking to dismiss the operative complaint has merit since Plaintiffs now seek to amend the Complaint to cure the deficiencies. (*Id*. at 12-13.) Han argues that the allegedly separate, new predicate acts

do not constitute new evidence and thus the amendment is not necessary or meritorious.  (*Id*. at 13.)

Plaintiffs aver that the newly proposed complaint is "a substantial upgrade from the SAC, with new facts, new legal theories and new specifics and details to strengthen plaintiffs' case." (ECF No. 56 at 6.)  Plaintiffs further respond that the evidence shows Han stole funds from the Plaintiffs, Han acquired 40% ownership interest in JLK, transferred funds to and from various accounts, and retained the car retrieved from stolen monies which makes him equally liable to Tang.  (ECF No. 57 at 15, 17.)  They also allege, in passing, that they succeed under the "Investment Injury" rule in demonstrating that Defendants have tried to conceal their racketeering activities by investing in offshore accounts.  (*Id*. at 15.)

## IV.    <u>DISCUSSION</u>

### A.    **Motion to Dismiss**

#### a.  **Legal Standard**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.

"[T]he pleading standard Rule 8 announces . . . demands more than an unadorned, the defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  A claim has facial plausibility when the plaintiff pleads sufficient facts allowing

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556–57 (internal citations omitted)).

When considering a motion to dismiss, the Court assumes all well-pleaded facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). However, this tenet does not apply to legal conclusions or "threadbare recitals of a cause of action's elements." *Iqbal*, 556 U.S. at 663. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. More is required. *See id.*; *see also Rozz v. Town of Hempstead*, No. 20-CV-1812 (JMA) (AYS), 2023 U.S. Dist. LEXIS 56996, at *9-10 (E.D.N.Y. Mar. 31, 2023) (citing *Iqbal* and *Twombly* as the standard cases for deciding a motion to dismiss); *Solomon v. Flipps Media, Inc*., No. 22-cv-5508 (JMA) (JMW), 2023 U.S. Dist. LEXIS 176480, at *3-4 (E.D.N.Y Sept. 30, 2023) (same).

### b. Application

#### i. Subject Matter Jurisdiction

Defendants claim that the court lacks subject matter jurisdiction because the parties are not diverse. Plaintiffs, however, claim there is jurisdiction in light of the alleged RICO claims.

The Court in *JP Morgan Chase Bank, N.A. v. Nowak* was faced with a similar situation as here. 2024 U.S. Dist. LEXIS 60710, at *6 (S.D.N.Y. Mar. 28, 2024). There, Judge Oetken stated the following:

> District courts have jurisdiction under 28 U.S.C. § 1331 when a plaintiff "pleads a colorable claim 'arising under' the . . . laws of the United States." Chase does so here, as it pleads claims under RICO, a federal statute. The Court can then also exercise "supplemental jurisdiction over all other claims that are so related to claims in the action

within such original jurisdiction that they form part of the same case or controversy." As a result, the Court denies Nowak's motion to dismiss the complaint for lack of subject matter jurisdiction.

*Id.* (internal citations omitted).  Here, the Court likewise has subject matter jurisdiction given the RICO claims alleged by Plaintiff.  As a result, both Defendants' attempt to dismiss the claims based on subject matter jurisdiction should be denied.

## ii.  Standing Under Article III

Standing under Article III requires: (1) an injury in fact; (2) a causal connection between the injury and alleged misconduct; and (3) a likelihood that plaintiffs' injury will be redressed by a decision in their favor.  *Oliver v. Am. Express Co.,* No. 19-CV-566 (NGG) (SMG), 2020 U.S. Dist. LEXIS 76688, at *13-14 (E.D.N.Y. Apr. 30, 2020).

Beginning with Plaintiffs' alleged injury, to establish Article III standing, plaintiffs must show that they have suffered concrete harm.  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 418 (2021); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Maddox v. Bank of New York Mellon Tr. Co., N.A.*, 19 F.4th 58, 65 (2d Cir. 2021) ("True, the Maddoxes may have suffered a nebulous risk of future harm . . . but that risk, which was not alleged to have materialized, cannot form the basis of Article III standing."). The most obvious harms are tangible monetary or physical harms.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016); *Day v. Tractor Supply Co.,* 22-CV-489-JLS-MJR, 2022 U.S. Dist. LEXIS 217201, at *7-8 (W.D.N.Y. Nov. 30, 2022) (citing *TransUnion,* 594 U.S. at 415).

Notably, the "prudential standing rule . . . normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves. [T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79,

86 (2d Cir. 2014) (quoting *Warth v. Seldin*, 422 U.S. 490, 499, 509 (1975)); *see also In re Old Carco LLC*, 500 B.R. 683, 690-91 (Bankr. S.D.N.Y. Nov. 8, 2013) ("Prudential standing encompasses the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.") (internal citations omitted).

Regarding the causal connection, a plaintiff must show that the injury is "fairly traceable to the challenged conduct of the defendant, and not the result of the independent action of some third party not before the court." *Farrakhan v. Anti-Defamation League,* No. 23cv9110 (DLC), 2024 U.S. Dist. LEXIS 64187, at *9 (S.D.N.Y. Apr. 5, 2024) (quoting *Atares Bais Yaakov Academy of Rockland v. Town of Clarkstown*, 88 F.4th 344, 352-353 (2d Cir. 2023)).

And finally, for the redressability requirement, the plaintiff must show "that it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit." *Oliver*, 2020 U.S. Dist. LEXIS 76688 at *21 (internal citations omitted). Specifically, "[w]hen the injury alleged is caused by the illegal conduct, in many instances (at least where continuation of the illegal conduct will continue to cause harm), the cessation of the illegal conduct will be likely to at least diminish further instance of the injury." *Id*. at *22.

Here, Plaintiffs allege that they were harmed as a result of Defendants' misconduct.  (*See generally* ECF No. 33.)  They allege that Defendants engaged in a series of frauds including:

<u>Mail and Wire Frauds</u>

- Persuading Zou to purchase all real estate from ZWT LLC (ECF No. 33 ¶¶ 41-42);

- Tang told Zou she bought Summer Sands Motel for $1.85 million, but the actual sale price was $1.25 million and Tang pocketed the difference (*id.* ¶ 46);

33

- Tang borrowed $940,000 from Plaintiffs Li and misrepresented that it would be used for the company, but Tang pocketed the money (*id.* ¶¶ 47-50, 64);

- Tang forged Zou's signature to sell the Carousal Motel (*id.* ¶¶ 52, 70);

- Tang transferred ownership interest to her son and away from Zou (*id.* ¶¶ 51, 53);

- Tang borrowed another $100,000 from Zou and told him she would pay him back once the Summer Sands Motel became profitable (*id.* ¶ 67);

- Using ill-gotten gains to purchase property through TL 403 LLC (*id.* ¶ 79); and

- Tang also schemed to sell Summer Sands by telling Zou the price was $4.75 million when, in reality, it was being sold to Harrars for only $3.5 million (*id.* ¶ 82)

Immigration Fraud

- Bringing her niece into the United States (ECF No. 33 ¶ 85);

- Getting a visa for her friend's fiancée to enter the United States (*id*. ¶ 86);

- Devising plans for Chinese investors to come to the United States (*id*. ¶ 87); and

- Answering falsely on immigration forms (*id*. ¶ 89)

Tax Fraud

- Falsifying tax records to make JLK appear less profitable (ECF No. 33 ¶¶ 68, 69, 72, 73, 74, 75, 76, 77)

Plaintiffs were clearly injured from Defendants' misrepresentations that the monies loaned would be used for company purposes.  Specifically, both Plaintiffs lent Defendant Tang over $1 million.  (*See* ECF No. 33); *PharmaCychecker.com LLC v. Nat'l Ass'n of Bds. of Pharm.,* 2024 U.S. Dist. LEXIS 49747, at *18 (S.D.N.Y. Mar. 20, 2024) ("That sort of monetary harm[] is among [t]he most obvious . . . traditional tangible harms, and it readily qualif[ies] as [a] concrete injur[y] under Article III.") (quoting *TransUnion,* 594 U.S. at 423); *see also Pena v. British Airways, PLC (UK)*, 849 F. Appx. 13, 14 (2d Cir. 2021) (finding that plaintiff had standing in a monetary fraud case where his personal information was exposed to hackers and his

34

information was subsequently misused by hackers totaling $1,000, forcing plaintiff to spend time and money resolving these transactions).

However, where a plaintiff has not demonstrated that a defendant's actions caused them any injury, such as misrepresentations on tax documents that would defraud the IRS and immigration frauds to defraud the appropriate authorities, courts have found that this is not enough to demonstrate standing. *See Thornton v. Shaker Ridge Country Club, Inc*., No. 07-CV-761 (DRH), 2007 U.S. Dist. LEXIS 94082, at *16-17 (S.D.N.Y. Dec. 26, 2007) ("[P]rivate citizens cannot enforce the provisions of the Tax Code because that is the duty of the Secretary of the Treasury and the Commissioner of the Internal Revenue Service, who are charged with the responsibility of administering and enforcing the Tax Code, including allegations of suspected fraud.") (internal citations and alterations omitted); *Schneorson v. Franklyn (In re Schneorson*), Nos. 1-22-40494-jmm, 1-22-01025-jmm, 2022 Bankr. LEXIS 2732, at *36 (Bankr. E.D.N.Y. Sept. 29, 2022) ("To the extent [Plaintiff] alleges that Defendants committed civil tax fraud, Plaintiff lacks prudential standing to pursue those claims on behalf of the taxing authorities.").

Here, Defendants' alleged misconduct regarding the alleged immigration frauds would not cause injury upon Plaintiffs—instead, the frauds would injure immigration authorities but would have *no effect* on Plaintiffs themselves. For example, Plaintiffs have not stated that the loaned monies were used in any way to lure investors to the United States. In contrast, Plaintiff Zou was monetarily injured because of Defendants' tax frauds. In Plaintiffs' motion for reconsideration for a discovery motion (ECF No. 90), Plaintiffs explain that they have had to pay back almost $5 million in tax liabilities because of Defendants' fraud: "Defendants' massive tax frauds created liabilities/debts for Zou in about $4,944,795…who is the founder, owner/partner of JLK, LLC." (*Id.* at 2.) This means that Plaintiff Zou was directly injured as a result of

Defendant Tang's tax fraud. *See Henry v. United States*, No. 02-968, 2002 U.S. Dist. LEXIS 17418, at *22-23 (E.D. La. Sept. 13, 2002) ("[T]he right to prosecute taxpayers for tax fraud is within the exclusive jurisdiction of the Government. Plaintiff has standing only to prosecute his own refund claim, and he fails to cite any authority which affords him the right to orchestrate the prosecution of another taxpayer."). However, given that Plaintiff Li holds no title in JLK and therefore would not have to pay back any JLK's tax liabilities, she has no standing under Article III for the tax fraud. Accordingly, neither Plaintiff has established injuries for the immigration fraud and only Zou has demonstrated standing for the tax frauds. Both Plaintiffs, however, would be able to bring claims concerning the monetary frauds committed by mail and wire.

### iii.  Standing Under RICO

Separate from Article III standing, to bring RICO claims under 18 U.S.C. § 1962, the plaintiff must demonstrate that the RICO violation was the but-for cause of plaintiff's injury, "meaning that but for the RICO violation, he would not have been injured." *Alix v. McKinsey & Co.*, 23 F.4th 196, 203 (2d Cir. 2022), *cert. denied*, 214 L. Ed. 2d 132, 143 S. Ct. 302 (2022) (internal quotations omitted). A plaintiff must also establish that the RICO violation was "the proximate cause of his injury," which requires some "direct relation between the injury asserted and the injurious conduct alleged." *Nygard v. Bacon*, No. 19-CV-1559 (LGS)(KNF), 2021 WL 4312581, at *43 (S.D.N.Y. Mar. 31, 2021) (internal quotations omitted), *report and recommendation adopted*, 2021 WL 3721347 (S.D.N.Y. Aug. 20, 2021).

As discussed above with respect to Article III standing, Plaintiffs have similarly failed to demonstrate standing for their RICO claims for the immigration frauds and Plaintiff Li has not established standing for the tax fraud. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006) ("The direct victim of this conduct was the State of New York, not Ideal. It was the State

36

that was being defrauded and the State that lost tax revenue as a result."); *Holmes High Rustler, LLC v. Gomez*, No. 15-cv-02086-JSC, 2015 U.S. Dist. LEXIS 170379, at *19-20 (N.D. Ca. Dec. 18, 2015) (finding that the "direct victim of the immigration fraud" is the United States government and that the complaint "d[id] not sufficiently allege that the scheme to harbor undocumented immigrants and charge illegal rent proximately caused any specific injury to Plaintiff's business or property"); *see also United States v. Chao Fan Xu*, 706 F.3d 965, 979 (9th Cir. 2013) (noting that defendants engaged in immigration fraud to fulfill the purpose of the enterprise—to use the illicit monies in the United States and escape from China).

In contrast, Plaintiff Zou has alleged that he has had to pay tax liabilities as a result of Defendant Tang's tax fraud.  (*See* ECF No. 90); *see also O'Hagin's, Inc. v. UBS AG*, No. SA CV 16-0716-DOC (JEMx), 2017 U.S. Dist. LEXIS 236727, at *16 (C.D. Cal. Feb. 9, 2017) (finding that plaintiffs had standing because they had to pay $3 million in tax liabilities and the misconduct "caused an injury which created a concrete financial loss"); *cf. In re Conte*, No. 22-CV-3109 (DG) (JMW), 2023 U.S. Dist. LEXIS 168777, at *34 (E.D.N.Y. July 3, 2023) (stating that plaintiff lacked standing to bring RICO claims based on tax fraud since simply "defrauding the IRS is not an injury to Plaintiff").

For these reasons, like standing under Article III *supra*, Plaintiff Li has no standing to bring the tax fraud related predicate act, and neither Plaintiff has standing to bring the immigration fraud predicate act under their RICO claims.

### 1.  Domestic Injury

Defendant Tang claims that transferring monies to and from Chinese banks does not constitute a domestic injury.  (ECF No. 54 at 39-40.)

"Domestic injuries" refer to injuries that occur within the United States rather than abroad. *RICO: Civil and Criminal Law Strategy* § 3.04A. The injury must occur to property within the United States, which would in turn, affect bank accounts located within the United States. *See Bascuñán v. Elsaca*, 874 F.3d 806, 819 (2d Cir. 2017). As to misconduct occurring abroad, the court in *Bascuñán* explained:

> [A]n injury to tangible property is generally a domestic injury only if the property was physically located in the United States, and that a defendant's use of the U.S. financial system to conceal or effectuate his tort does not, on its own, turn an otherwise foreign injury into a domestic one. A defendant's use of the United States financial system to conceal or effectuate his tort does not, on its own, turn an otherwise foreign injury into a domestic one. The use of bank accounts located within the United States to facilitate or conceal the theft of property located outside of the United States does not, on its own, establish a domestic injury.

*Id.* (emphasis added).

Given that Tang's monies did not touch the United States' banking system, Plaintiffs have not sufficiently alleged a domestic injury regarding the sums exchanged in China alone. Accordingly, any related allegations should be dismissed.

## 2. Injury to Business or Property

Defendant Tang maintains that the claim for damages regarding the sale of Summer Sands Motel has not yet come to fruition since it is part of a pending lawsuit in South Carolina. (ECF No. 154-1 at 27.) JLK still owns the property, and the outcome of that case has yet to be determined. (*Id.*)

"A cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Mkts., LLC,* 347 Fed. Appx. 711, 712 (2d Cir. 2009); *Panabroker Protecting & Indem. Assoc. v. Vneshprombank,* No. 16-CV-2120 (ALC), 2017 U.S. Dist. LEXIS 159393, at *10 (S.D.N.Y. Sept. 26, 2017) (same); *GWG MCA Capital, Inc. v. Nulook Capital, LLC,* No. 17-CV-1724

(GRB), 2019 U.S. Dist. LEXIS 36983, at *14 (E.D.N.Y. Mar. 7, 2019) (dismissing plaintiff's RICO claims since plaintiff did not show clear and definite damages necessary for standing).

This District grappled with a similar situation in *Sky Med. Supply Inc. v. SCS Support Claims Servs.*, 17 F. Supp. 3d 207, 214 (E.D.N.Y. 2014). There, the Court stated:

> According to plaintiff's own representations to the Court, plaintiff is currently challenging the denials of an unknown number of its no-fault claims in arbitration proceedings and state court actions. At issue in those proceedings are the same no-fault claims whose denials have prompted this action. Thus, *the full extent of plaintiff's RICO damages is contingent upon the results in pending proceedings, and is not clear and definite at this time*. Under these circumstances, clear Second Circuit law requires dismissal of plaintiff's RICO claims, as to all defendants, without prejudice to plaintiff bringing its RICO claims once its damages have become clear and definite.

*Id*. (emphasis added).

Here, Plaintiffs have not demonstrated a clear and definite injury necessary for standing with respect to the sale of the Summer Sands Motel considering the pending lawsuit in a different state. Plaintiffs only summarily assert that Defendants attempted to secretly sell the motel to Harrars at a discounted price, with Harrars making side payments directly to Defendants in return. It is additionally unclear from the operative complaint whether the Defendants ever entered a sales contract with Harrars. Plaintiffs merely state, "…instead defendants entered into a contract with Harrars …" (ECF No. 33 ¶ 83.) Earlier however, Plaintiffs stated that Plaintiff Zou refused to sign the consent to sell form. (*Id*.) Subsequently, Plaintiffs never state if or how Defendants obtained Plaintiff Zou's signature for the consent to sell from. (*Id*.)

Thus, Plaintiffs' injuries are not yet clear and should be dismissed, without prejudice, with respect to the sale of the motel.

#### iv.  Conflicts of Interest and Derivative Claims

Defendant Tang next alleges there are a multitude of conflicts between Plaintiff Zou and JLK as well as Plaintiffs' counsel and his clients, namely because Zou asserts both individual

and derivative claims and cannot fairly represent JLK as required under Fed. R. Civ. P. 23.1.  (*Id.* at 15-16.)  Further, Zou has sued JLK in a previous action in South Carolina.  (*Id.* at 16-17.)  As to Plaintiffs' attorney, he has failed to include the LLC as a necessary party and failed to bring certain claims against the LLC, including claims for dividends, distributions, or repayment of a loan, an inspection of the books and records, or an improper sale of the LLC's real property.  (*Id.* at 12, 17-20.)  Since both Plaintiffs have claims again JLK-- a party that is named only derivatively in this case-- counsel is thus representing parties with claims adverse to one another.  (*Id.* at 20-21.)

In turn, Plaintiffs assert that there are no conflicts of interests between JLK and the Plaintiffs or counsel and Plaintiffs.  (ECF No. 56 at 12.)  Plaintiff Zou was at one point the 100% owner of JLK and suffered separate injuries from the entity, and *Defendants*, *not* JLK, breached their duty to Zou.  (*Id.*)  Additionally, the only other shareholders for JLK are Tang and Han— the two Defendants in this matter.  Further, the South Carolina action has since been discontinued to avoid confusion.  (*Id.* at 13.) Plaintiffs' counsel also avers that he has never had contact with JLK.  (*Id.* at 27.)

"A shareholder generally does not have standing to bring an individual action under RICO to redress injuries to the corporation in which he owns stock."  *Manson v. Stacescu*, 11 F.3d 1127, 1131 (2d Cir. 1993).  "Since the shareholder's injury, like that of the creditor, generally is derivative of the injury to the corporation, the shareholder's injury is not related directly to the defendant's injurious conduct."  *Id.*  In other words, "[t]he gist of the complaint in a derivative action is an injury to the corporation, its stock, or its property without severance or distribution among individual holders."  *Lakonia Mgmt. Ltd. v. Meriwether,* 106 F. Supp. 2d 540, 551 (S.D.N.Y. 2000).

Plaintiff Zou's suit against Defendants versus those brought derivatively on behalf of JLK represent distinct injuries.  However, Plaintiffs have not made the required showing that a demand upon Defendants would be futile.  The SAC merely states: "Any demand for action from defendants would be futile, unnecessary, including for the reasons identified in the complaint." (ECF No. 33 ¶ 18); *Diana Allen Life Ins. Trust v. BP P.L.C.*, 06 Civ. 14209 (PAC) 2008 U.S. Dist. LEXIS 25883, at * 12 n.8 (S.D.N.Y. Mar. 31, 2008) (stating that a plaintiff suing derivatively must first made a demand to pursue the claim or allege that the demand would be futile in order to be excused from the demand requirement);  *Cordts-Auth v. Crunk, LLC*, 815 F. Supp. 2d 778, 793 (S.D.N.Y. 2011) (stating that a plaintiff must first state with particularity his efforts to obtain the desired action from other members or shareholders and the reasons for not obtaining the action or not making the effort at all).  Given that Plaintiffs have not even attempted to allege with any particularity whether they submitted a demand upon Defendants or why such a demand would be futile, all derivative claims should be brought in a separate suit and should be denied at this juncture.

As to the conflict with Plaintiffs' attorney—the undersigned finds none. The case against JLK in South Carolina has since been terminated.  (ECF No. 16-2.)  Furthermore, Plaintiff's attorney, Ming Hai, did not represent JLK in the South Carolina suit.  (ECF No. 54-7 and 54-8.) Accordingly, any purported conflict between Plaintiffs and their attorney is nonexistent.

### v.  Substantive RICO Violations

#### 1.  Statute of Limitation

Before addressing the merits of the RICO claims, the Court must first satisfy itself that Plaintiffs' claims are within the applicable statute of limitation.  Defendant Tang alleges that the predicate acts have not been committed within ten years of each other.  (ECF No. 54-1 at 36.)

Further, Defendant Tang states that Plaintiffs could have discovered the alleged frauds earlier. (*Id.* at 42.)

A civil RICO claim has a four-year statute of limitations period. *Town of Mamakating v. Lamm,* 651 Fed. Appx. 51, 53 (2d Cir. 2016); *see Ojeda v. Mendez,* No. 22-2700, 2024 U.S. App. LEXIS 1055, at *4-5 (2d Cir. Jan. 17, 2024) (finding that plaintiff's civil RICO claim brought in 2020 concerning injuries from 2012 was time-barred). The limitations period for RICO claims starts to run when Plaintiff discovered, or he should have discovered, his alleged injury rather than the pattern of racketeering activity itself. *See Conte v. Tapps Supermarket, Inc.*, No. 22-CV-3109 (DG) (JMW), 2022 WL 4539267, at *5-6 (E.D.N.Y. Sept. 28, 2022); *Town of Mamakating,* 651 Fed. Appx. at 53 (stating that the "discovery of the injury triggers the limitations period," and not discovery of the other RICO elements). The clock does not begin to run when the plaintiff could have been on inquiry notice. *See Schwab v. Philip Morris USA, Inc.,* No. CV 04-1945 (JBW), 2005 U.S. Dist. LEXIS 2256, at *15, 19, 25 (E.D.N.Y. Oct. 6, 2005) (finding that the statute of limitations did not expire as claimed by defendants because the plaintiffs would have only been aware of the cigarettes' negative side effects as early as 2002).

An exception to the limitations period is the "separate accrual" rule in which "a new claim accrues and the four-year limitation period begins anew each time a plaintiff discovers or should have discovered *a new and independent* injury." *See Davis v. Yeroushalmi,* 985 F. Supp. 2d 349, 360 (E.D.N.Y. 2013) (emphasis in original). However, once a reasonable person should have known, the four-year statute of limitations cannot restart. *421-A Tenants Ass'n v. 125 Court St. LLC,* 760 Fed. Appx. 44, 49-50 (2d Cir. 2019) (noting that the plaintiffs could "not avoid the statute of limitations by characterizing each new lease as a new and independent injury"). That is, if the subsequent injuries are "derive[d] from" an earlier incident, the new

42

injuries cannot be considered "new and independent." *Simmons v. Reich,* No. 19-CV-3316(EK)(ST), 2020 U.S. Dist. LEXIS 223479, at *22 (E.D.N.Y. Nov. 30, 2020); *Wang v. Yien-Koo King*, No. 18-CV-8948, 2019 U.S. Dist. LEXIS 67956, 2019 WL 1763230, at *6 (S.D.N.Y. Apr. 22, 2019) (stating that claimants "cannot use independent, new predicate acts as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period.")

Here, as to the discovery accrual, Plaintiffs could have discovered certain incidents sooner.  For example, as to the concealing of the Summer Sands motel's purchase price and the sale of Carousel motel, Plaintiffs could have discovered this as early as 2016.  (*See* ECF No. 54-3) (discussing recorded documentation for 2016 sale of the Carousel motel).[6]  Therefore, they should have brought this claim forward in 2020.  *See Peralta v. Peralta*, No. 16-cv-8890 (ALC), 2018 U.S. Dist. LEXIS 43581, at *13 (S.D.N.Y. Mar. 16, 2018) (finding that plaintiff knew of defendant's fraud since 2009 when someone informed him that the divorce certificate was fraudulent but he did not file the complaint until 2016); *Papapietro v. Clott,* 22 Civ. 1318 (RPK) (VMS), 2023 U.S. Dist. LEXIS 16492, at *37 (E.D.N.Y. Jan. 30, 2023) (finding plaintiff's fraud claim time-barred since plaintiff had knowledge of the fraud since 2009 when he retained an attorney to help him recover the monies and the suit began in 2022 but the limitations period expired in 2015); *cf Burke v. Dowling*, 944 F. Supp. 1036, 1071 (E.D.N.Y. 1995) (finding the claim not time barred where plaintiffs alleged that defendants obstructed them from discovering the fraud).  Indeed, Plaintiffs acknowledge the deficiencies in the SAC by adding the very points

---

[6] Notably, Defendant Tang states that Zou's signature was not forged and he was present during the authorization of the sale on August 22, 2016.  (ECF No. 56-4 at 12.)  Zou however states he was out of the country on that date and submits passport documentation as support.  (ECF No. 56-3.)  The documentation appears to show that Zou left the United States on August 12, 2016 and returned on September 19, 2016.  (ECF Nos. 56-2 and 56-5.)  Thus, the passport information supports Plaintiff's assertions that he was in China at the time of the Carousel sale signing.

that Tang raised in her prior letter motion to dismiss.  For example, Plaintiffs have added entirely new sections on standing and statutes of limitation.  (ECF No. 53-3.)

In addition to the lack of standing for the immigration fraud claims, Plaintiffs have also failed to state the date that the alleged immigration frauds took place for the Court to assess its timeliness.  (*See* ECF No. 33 ¶ 85) ("Starting on a date unknown to the plaintiffs subject to further discovery…[Defendants] committed immigration visa fraud…."); (*see also* ECF No. 76) (Defendant Tang's motion to quash a subpoena for Defendants' immigration applications dating back to 1996).  Thus, on their face, these claims should be dismissed.

It appears that those frauds could not and were not discovered earlier given Defendants' concealment of the records.[7]  Notably, Plaintiffs state that the injuries stemming from Defendants' wire and mail fraud and other predicate acts "occurred between on or about January 19th, 2015" but were discovered for the first time "by plaintiffs through attorney's investigations in 2022."  (ECF No. 33 ¶ 105; *id.* ¶ 46.)  Plaintiffs further allege that "Defendants have concealed from plaintiffs all books, records, tax documents, tax returns till on or about February 2023, when Defendants' attorney Mr. Gene Connell for the first time provided copies of partial tax re[turns] from 2015 to 2021." (*Id.* ¶ 54.)  Consequently, all allegations except for the Summer Sands and Carousel Motel transactions and immigration fraud allegations, were made timely.

### 2.  Securities Fraud Exception

Defendant Tang asserts that the RICO claims should be dismissed because of the securities fraud exception.

---

[7] The other frauds would constitute separate acts because they would amount to an individual, not a derivative, injury for Zou.

Section 107 of the Private Securities Litigation Reform Act, otherwise known as the "RICO Amendment," provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." *Bongiorno v. Baquet,* 2021 U.S. Dist. LEXIS 180038, at *40 (S.D.N.Y. Sept. 20, 2021) (quoting 18 U.S.C. § 1964(c)).  This securities fraud exception to the RICO Act essentially prohibits the use of RICO claims for conduct that constitutes securities fraud.  *See Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC,* 286 F. Supp. 3d 634, 643 (S.D.N.Y. 2017).  This exception ensures that securities fraud claims[8] are addressed within the specialized framework of federal securities laws rather than through the broader and potentially more punitive RICO statute.  *Id.*

The scope of the RICO Amendment is broad and bars *any* claim that is actionable as fraud in the purchase or sale of securities, even in situations where a plaintiff lacks standing or is otherwise precluded from asserting a valid claim under the securities laws.  *Zohar CDO 2003-1, Ltd.,* 286 F. Supp. 3d at 643.  In other words, the exception applies when the predicate acts of the RICO claim are based on conduct that can be classified as securities fraud, including fraud related to the purchase or sale of securities, shares, or ownership interests.  *In re Platinum-Beechwood Litig.*, No. 18 Civ. 6658 (JSR), 2019 U.S. Dist. LEXIS 104562, 2019 WL 2569653, at *4 (S.D.N.Y. June 21, 2019) (quoting *MLSMK Inv. Co. v. JP Morgan Chase & Co*., 651 F.3d 268, 280 (2d Cir. 2011)).  As plainly stated in *D'Addario v. D'Addario,* 75 F.4th 86 (2d Cir. 2023), "for a claim to be barred, the fraud must be '*in* the purchase or sale of securities,' which means that the actual purchase or sale of securities was fraudulent; it is not enough for securities

---

[8]  "The elements of a private securities fraud claim based on violations of § 10(b) and Rule 10b-5 are: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Clune v. Barry*, 16 Civ. 4441 (NSR) (JCM), 2023 U.S. Dist. LEXIS 65413, at *20 (S.D.N.Y. Apr. 13, 2023) (citing *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 332 (S.D.N.Y. 2012)).

45

to be an incidental feature of an overall scheme." *Id*. at 93 (quoting 18 U.S.C. § 1964(c)). Further, "[f]or the fraud to coincide with a securities transaction, a claim must necessarily allege, necessarily involve, or necessarily rest on the purchase or sale of securities." *Id*. at 96 (internal citations and quotations omitted).

Thus, the issue is whether the transference of ownership interests in JLK can be considered a sale of a security interest here. Here, the Court finds that the ownership interests in JLK are not equivalent to security[9] interests found in other cases. *See Clune v. Barry,* 16 Civ. 4441 (NSR) (JCM), 2023 WL 2929388, at *2, 7 (S.D.N.Y. Apr. 13, 2023) (finding that the corporation's shares were securities and defendants' misrepresentations about the shares' value constituted a securities fraud claim which the RICO amendment prohibited); *Bongiorno v. Baquet*, 20-cv-7288 (LJL), 2021 WL 4311169 (S.D.N.Y. Sept. 20, 2021) (finding that promissory notes were securities under federal securities law and that the misrepresentations in the purchase and sale of the notes were securities claims warranting dismissal under the RICO amendment). Further, JLK is not a corporate entity with a board of directors, several shareholders, or publicly traded—rather, it is an LLC with only two members (Tang and Zou). Thus, the Court finds that the securities fraud exception should not apply and Plaintiffs' RICO claim can move forward.

### 3. Merits of Claims

To state a violation under section 1962(c), a plaintiff must plead "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity." *Anatian v. Coutts Bank (Switzerland) Ltd.*, 193 F.3d 85, 88 (2d Cir. 1999) (internal citations and quotations omitted).

---

[9] A security is "[a]n instrument that evidences the holder's ownership rights in a firm (e.g., a stock), the holder's creditor relationship with a firm or government (e.g., a bond), or the holder's other rights (e.g., an option)." Security Definition, *Black's Law Dictionary* (10th ed. 2014), *available* at Westlaw.

### a. Defendants' Conduct of Racketeering Activity

Defendant Tang alleges that Plaintiffs allege various predicate acts that are not RICO predicate acts under 18 U.S.C. § 1961(1) or are otherwise insufficiently stated.

Predicate acts are comprised of at least two racketeering activities that an enterprise's member engages in and are both related to each other and proximate to the enterprise. *U.S. v. Delgado*, 972 F.3d 63, 79 (2d Cir. 2020). As relevant here, racketeering activity includes any of the following acts indictable under any of the following provisions of Title 18 of the United States Code:

- 18 U.S.C. § 1028: relating to fraud and related activity in connection with identification documents
- 18 U.S.C. § 1029: relating to fraud and related activity in connection with access devices
- 18 U.S.C. § 274: bringing in and harboring certain aliens
- 18 U.S.C. § 277: relating to aiding or assisting certain aliens to enter the US
- 18 U.S.C. §§ 1341, 1343: relating to mail and wire fraud
- 18 U.S.C. § 1425: relating to the procurement of citizenship or nationalization unlawfully
- 18 U.S.C. § 1426: relating to the reproduction of naturalization or citizenship papers
- 18 U.S.C. § 1427: relating to the sale of naturalization or citizenship papers
- 18 U.S.C. § 1503: relating to obstruction of justice
- 18 U.S.C. § 1546: relating to fraud and misuse of visas, permits, and other documents
- 18 U.S.C. § 1952: relating to racketeering
- 18 U.S.C. § 1956: relating to the laundering of monetary instruments
- 18 U.S.C. § 1957: relating to engaging in monetary transactions in property derived from specified unlawful activity
- 18 U.S.C. §§ 2314-15: relating to interstate transportation of stolen property
- 18 U.S.C. § 5311-5324: relating to currency reporting violations

18 U.S.C. §§ 1961(1)(B), (D), (F).

Plaintiffs allege that Defendants engaged in a series of frauds including wire, mail, tax, and immigration frauds as well as money laundering.  (*See generally* ECF No. 33.)  Specifically, both Plaintiffs loaned Defendant Tang more than $1 million dollars as a contribution towards JLK LLC, but Tang instead pocketed the monies for herself.  In addition, Tang and Han illegally transferred interests in JLK to legalize the transaction and diverted company income away from

Zou, the rightful owner.  Nevertheless, Plaintiffs allege several acts of misconduct that are *not* predicate acts—these include:

- Using Tang's nieces and other women to "bait" Plaintiff Zou (ECF No. 33 ¶¶ 14, 40, 42.)

- Alleging a false physical illness to get an extension to file 2022 tax returns is not a racketeering act (ECF No. 33 ¶ 77.)

- Perjury is not a predicate act under the relevant RICO statute.  (ECF No. 33 ¶ 88); *Lynch v. Amoruso*, 232 F. Supp. 3d 460, 467 (S.D.N.Y. 2017) ("Perjury does not qualify as a predicate act.").

Additionally, the following allegations have been pled insufficiently and would thus not constitute a RICO predicate act here:

- For cash transferred in China alone, there is no domestic injury sufficient for a RICO claim (ECF No. 33 ¶¶ 50, 64).  Similarly, bank wires to and from a bank in South Carolina does not constitute wire fraud which has an interstate component attached to it[10] (ECF No. 33 ¶ 67.)

- Tang transferred of 40% of shares she owned to Han (*id*. ¶¶ 31, 51).  However, per the Operating Agreement, she was permitted to transfer her own shares to family members (*see* ECF No. 53-4 at 28.)

- As discussed above, given the speculative nature regarding the Summer Sands sale, the Court cannot opine on the damages to be conferred to Plaintiffs while the action is pending (ECF No. 33 ¶¶ 60-61.)

- Additionally mentioned above, all of Plaintiffs' immigration fraud allegations fail for failure to plead standing (ECF No. ¶¶ 84-88) and thus those actions cannot be deemed predicate acts here.

- As to the currency reporting violations pursuant to 31 U.S.C. §§ 5311-5324, Plaintiffs do not allege anything beyond an alleged threat to Li saying she would deny the $600,000 of Chinese currency she took from Li and the wire evidence would not be admissible in court.  Without any such evidence as to Tang and Li's conversation, Plaintiffs fail to

---

[10] *See Aliev v. Borukhov*, 15-CV-6113 (ERK) (JO), 2016 U.S. Dist. LEXIS 88856, at *37 (E.D.N.Y. July 8, 2016) ("All of RICO's subsections require an enterprise 'which is engaged in, or the activities of which affect, interstate or foreign commerce.'" (citing 18 U.S.C. § 1962(a)—(c)).  "The interstate commerce prong is RICO's 'jurisdictional element.'" *Id*. (citing *United States v. Barton*, 647 F.2d 224, 233 (2d Cir. 1981)).

establish this was a predicate act.[11]  (ECF No. 33 ¶ 65.)  Plaintiffs also point to
purportedly false statements on immigration application as support for this predicate act.
However, they allege nothing further to establish how Tang could have misreported any
currency on such applications (*see id.* ¶ 88.)

- Regarding the extortion claims under 18 U.S.C. § 1951, Plaintiffs have done nothing
  beyond exclaiming that Tang "threatened and blackmailed Chunlan Li by saying that she
  would deny the $600,000 worth of Chinese currency…that she took from plaintiff
  Chunlan Li, the Chinese evidences of wiring of said funds in China would not be
  admissible in court, if Chunlan Li would take the matter to court, for purpose to deter
  plaintiffs from exercising their legal rights and reclaiming their lost funds." (ECF No. 33
  ¶ 65.)  This statement is insufficient to state a claim for extortion.  *See Entretelas
  Americanas S.A. v. Soler*, 19 Civ. 03658 (LAK) (RWL), 2020 U.S. Dist. LEXIS 20692, at
  *26 (S.D.N.Y. Feb. 3, 2020) (finding that plaintiff did not allege that defendants used
  "force, violence, or fear," as required by the extortion statute) (citing 18 U.S.C. §
  1951(b)(2)).  Like *Soler*, there is no indication that Li was fearful of Li's threats to
  establish her extortion claim.

- For claims concerning fraud in connection with access devices under 18 U.S.C. § 1028,
  all these actions relate to the alleged immigration frauds, which should be dismissed.

- Finally, as to Defendants' purported obstruction of justice under 18 U.S.C. § 1503,
  Plaintiffs' allegations with respect to this statute either relates to the recommended
  dismissed immigration fraud violations or have no relevance on the Court's ruling at this
  juncture.  (*See* ECF No. 33 ¶¶ 87-88, 93-96); *see also United States v. Triumph Capital
  Group, Inc.*, 260 F. Supp. 2d 470, 475 (D. Conn. 2003) (stating that the elements for an
  obstruction of justice claim include that defendant "(1) endeavored (2) corruptly (3) to
  influence or obstruct the due administration of justice").

The racketeering acts that remain, then, are:

- 18 U.S.C. §§ 1341 and 1343: Wire and mail fraud (ECF No. 33 ¶¶ 62-64, 66, 68-69, 72-
  76);

- 18 U.S.C. §§ 1956-57: Money laundering (ECF No. 33 ¶¶ 62-64, 66, 68-69, 72-76); and

- 18 U.S.C. §§ 2314-2315: Transporting stolen property.  The claims that relate to
  Plaintiffs' derivative and immigration fraud claims which should be dismissed; however,
  the other claims with respect to sending monies back and forth should stand (ECF No. 33
  ¶¶ 47-48, 62-64, 66, 68-69, 72-76).

---

[11] For violations of reporting currency, the government must show "(1) the defendant engaged in acts of
structuring; (2) the defendant acted with knowledge that the financial institution involved was legally
obligated to report currency transactions in excess of $10,000; and (3) the defendant acted with the intent
to evade the reporting requirement."  *United States v. Nadeem*, No. 13 Cr. 424 (BMC), 2015 U.S. Dist.
LEXIS 135554, at *19 (E.D.N.Y. Oct. 5, 2015) (citing *United States v. MacPherson*, 424 F.3d 183, 189
(2d Cir. 2005)).

### b. Enterprise

As part of their claims, Plaintiffs allege that Defendants' organization, including its leadership, membership and associates constituted an enterprise under the applicable RICO statute. (*See generally* ECF No. 33.)

Under the RICO statute, "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Broadly stated, a RICO enterprise is "'a group of persons associated together for a common purpose of engaging in a course of conduct'" as a sustained organization, formal or informal, with "'various associates functioning as a continuing unit.'" *First Cap. Asset Mgmt., Inc. v. Saintwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (quoting *U.S. v. Turkette*, 452 U.S. 576, 583 (1981)). Crucially, the enterprise is not the pattern of racketeering activity, but an entity "separate and apart" from that activity. *Turkette*, 452 U.S. at 583; *Mark v. J.I. Racing*, No. 92-CV-5285 (FB), 1997 U.S. Dist. LEXIS 9931, at *13-14 (E.D.N.Y. July 9, 1997) ("[I]n a 1962(c) claim, the person and the enterprise referred to must be distinct.") (internal citations omitted); *City of New York v. Chavez*, 944 F. Supp. 2d 260, 275 (S.D.N.Y. 2013) ("If each act of fraud is not effective without the other acts of fraud, then a RICO enterprise exists."). That is, to establish a pattern of racketeering does not necessarily also establish the existence of a RICO entity. *Turkette,* 452 U.S. at 583.

Where, as here, an association-in-fact enterprise is alleged, the plaintiff must allege the following: a purpose, the relationships in the enterprise, and longevity to allow the members to pursue the purpose. *Fossil Grp., Inc. v. Angel Seller LLC*, 627 F. Supp. 3d 180, 204 (E.D.N.Y. 2022). Plaintiffs must also allege that defendants operated or managed the enterprise to succeed on a claim under 18 U.S.C. § 1962(c). *Id.*

According to the Complaint, Plaintiffs allege that the members of the enterprise came together to further the schemes and had shared interests in entities and shared profits, incomes and bank accounts.  (ECF No. 33 ¶ 29.)  Specifically, as to the enterprise's purpose, the Complaint states:

> To enrich Xiao Han, Jun Tang and their immediate family members by defrauding unsuspected investors and lenders, committing immigration visa frauds for large" legal fees" and payments, tax cheats and evasions, among other illegal activities; To enrich other members and associates of the organization by defrauding unsuspected investors and lenders, committing immigration visa frauds, tax cheats and evasions, among other illegal activities; To smuggling in family relatives from China to become new members of the association in fact enterprise by illegal means in violation of the U.S. immigration laws; To promote and advertise the organization's illegal business operations domestically and internationally; To transfer large sums of funds interstate and internationally in money laundering schemes; To protect the enterprise and its members from detection, apprehension and prosecutions by law enforcement, tax authorities as well as private lawsuits; To punish the organization's victims who dare to fight back.

> The manner and methods used by the Defendants and other members and associates of the enterprise to further the goals of the enterprise and to achieve its purposes included, but were not limited to, the following: each member aiding and abetting the other, to solicit and chase after unsuspected wealthy Chinese nationals for their money; to use fraudulent promises and guarantees to take in large sum investments and loans from the unsuspected victims with intention to forever keep the ill-gotten funds to themselves; to threaten victims from speaking out; to use large size of cash transactions to avoid IRS reporting rules and IRS detections; to use foreign country such as China as an intermediate money transfer station for money laundering purposes.

(ECF No. 33 ¶¶ 23-24.)  And as for the members of the enterprise, Plaintiffs allege that they include:

- Defendants;[12]
- Audrey Tang (Han's aunt and Tang's sister) who acted as the "day to day manager of the organization, taking orders and directives from Xiao Han and Jun Tang";
- Yuan Yuan, Tang's niece, who acted as bait to induce plaintiffs at Defendants' direction;
- Jing Jing, Tang's other niece used to entrap Plaintiff Zou;

---

[12] In addition to Tang's obvious involvement in the schemes, per the proposed Third Amended Complaint Han was deemed "extremely smart in money management, has been trained as a money person for the family, had experiences working in Financial Firms, and [Defendants] shared their assets/money together."  (ECF No. 53-3 ¶ 15.)

- Tang's parents in China and other "names unknown to plaintiffs" in China who acted as a money transfer station to "receive and transfer illegal fuds in the organization's international money laundering schemes"
- Travel Home LLC and TL403 LLC, two LLCs owned by Tang and controlled by Han, which received illegal monetary transfers
- Jia Jia, Tang's daughter who shared in illegal gains, and
- "other unnamed members."

(ECF No. 33 ¶ 14); (*see also id.* ¶ 47) (stating that Li transferred $600,000 in Chinese currency to Tang's parents who later wired it to Defendants).

Aside from Defendants' obvious involvement with the schemes, the undersigned looks to whether the other enterprise members shared a delineated role. Audrey Tang allegedly accepted cash from guests at the Summer Sands Motel and assisted with immigration fraud—specifically the plan to induce foreign investors to come to the United States and obtain green cards in exchange for cash. (ECF No. 33 ¶¶ 58, 87.) Further, Defendant Tang's acted as "bait" to distract Zou. As to Travelhome and TL403, Zou would send monies to and from that account (*Id*. ¶¶ 67, 80). Thus, these members would be enough to demonstrate that they functioned as a continuing unit. *See United States v. Riccobene*, 709 F.2d 214, 223 (3d Cir. 1983) ("It does require, however, that each person perform a role in the group consistent with the organizational structure established by the first element and which furthers the activities of the organization."). However, without stating anything beyond the fact that Tang's daughter kept the monies, it is unclear whether she participated in the frauds and whether she would be considered a member of the enterprise. (*See e.g.* ECF No. 33 ¶¶ 47, 53, 63).

The Court notes that it is a close call as to whether Plaintiffs have alleged an enterprise "separate and distinct" from the Defendants—that is, Plaintiffs narrowly escape the requirement that they must show that the enterprise existed apart from the alleged frauds. *See Schmidt v. Fleet Bank*, 16 F. Supp. 2d 340, 350 (S.D.N.Y. 1998) (stating that "[t]he only common factor

joining the various defendants is their alleged participation in Schick's scheme to defraud the plaintiffs" and therefore did not exist "separate and apart" from the predicate acts); *Satinwood, Inc.*, 385 F.3d at 174 (finding that the complaint failed to allege an enterprise where they did not detail how the conduct was separate and distinct from the predicate acts themselves or an otherwise hierarchy to establish an association-in-fact enterprise); *Contract Transp. Servs. v. New Era Lending LLC*, 17 Civ. 8224 (AT), 2018 U.S. Dist. LEXIS 241286, at *10-11 (S.D.N.Y. Oct. 26, 2018) (finding that plaintiffs did not assert how each defendant was associated with the enterprise much less how the parties know each other); *Jgiap RH 160 LLC v. Cri Holding Corp.*, No. 21-CV-02489-DG-JRC, 2023 U.S. Dist. LEXIS 144781, at *41 (E.D.N.Y. Aug. 16, 2023) (stating that defendants "came together strictly for the purpose of engaging in the alleged scheme"); *Lynn v. McCormick*, No. 17-CV-1183 (CS), 2017 U.S. Dist. LEXIS 207543, at *13 (S.D.N.Y. Dec. 18, 2017) ("Plaintiffs allege that Defendants came together for the purpose of engaging in the fraudulent activity that forms the basis of the asserted pattern of racketeering activity…Consequently, the enterprise and the pattern in this case are one and the same").  In contrast to these cases, what saves Plaintiffs is the alleged relationship between the Defendants and the other members of the enterprise and their associated role with the enterprise—that they are all family members—and its furtherance of the enterprise's purpose.  *See BC Liquidating, LLC v. Weinstein (In re BC Funding, LLC),* 519 B.R. 394, 420 (Bankr. E.D.N.Y. Oct. 31, 2014) (collecting cases where courts have held that an enterprise was present when it had a leader and the other defendants share familial relationships); *Pringle v. Garcia*, 2:09-cv-022-PPS, 2013 U.S. Dist. LEXIS 20482, at *22-23 (stating that the allegations against one member of the enterprise was enough to implicate her in the enterprise at the dismissal stage where plaintiff alleged that she was the grantor or transferor and even the signatory in the alleged fraudulent transactions).

53

Thus, as a matter of pleading, the allegations are sufficient. This, of course, does not establish proof which will bear out either in summary judgment or trial.

Finally, the court finds there is sufficient longevity to satisfy the third element since the fraud began around 2015 and continues to the present. (ECF No. 33 ¶ 25) ("The Enterprise was continuous in that it lasted for longer than two years (approximately ten years) and currently is ongoing, had an ascertainable structure, and acted in ways distinct from the predicate offenses alleged by Plaintiffs. Its long-term racketeering activities include a specific threat of repetition extending indefinitely into the future.")

At the dismissal stage, the Court finds that Plaintiffs satisfy all three elements to support an association-in-fact enterprise: purpose, the enterprise relationships, and longevity.

### c. Continuous, Related Pattern of Racketeering Activity

Having found that an enterprise exists, the undersigned next looks to whether Plaintiffs have established a pattern of racketeering activity.

A "pattern of racketeering activity" under the RICO statute "requires at least two acts of racketeering activity, one of which occurred after October 15, 1970 and the last of which occurred within ten years…after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). The "continuity" requirement for a racketeering pattern demands a plaintiff plead at least two predicate acts, and show that those acts are related and amount to, or pose a threat of, continuing criminal activity. *GICC Cap. Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 465 (2d Cir. 1995) (citing § 1961(5)). "A pattern of racketeering may be closed-ended or open-ended." *Rosner v. Rosner*, 766 F. Supp. 2d 422, 425 (E.D.N.Y. 2011). While a close-ended pattern has a discrete beginning and end, an open-ended pattern does not necessarily have a broad set of predicate acts, but consists of a pattern likely to persist in the future. *Id.* Additionally, RICO claims carry a relatedness requirement whereby predicate crimes must be

related to each other and to the whole enterprise. *Reich v. Lopez*, 858 F.3d 55, 60-61 (2d Cir. 2017) (citations omitted).

Plaintiffs have satisfied the requirement in demonstrating that at least two predicate acts were carried out by Defendant Tang within 10 years of one another. As to the continuity component, the operative complaint states: "The racketeering acts committed by the defendants are related, in that those have the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." (ECF No. 33 ¶ 35.) It further states an open-ended pattern of racketeering: "The frauds committed by the defendants show continuity, as those are repeated conducts over a long period of time, and ongoing, and by its nature projects into the future with a threat of repetition." (ECF No. 33 ¶ 34; *see also id* ¶¶ 53, 64.)

Further, given the relatedness of Defendants' mail and wire frauds as well as the money laundering and transportation of stolen property allegations, the Court finds that Plaintiffs have established a RICO pattern regarding those predicate acts. However, as to the immigration frauds and other recommended dismissed claims, there is no relation to the remaining predicate acts. *See Reich v. Lopez*, 858 F.3d 55, 60-61 (2d Cir. 2017) (finding that dissimilar "methods of commission, victims, and result of the predicate acts . . . weigh against relatedness.").

Accordingly, Plaintiff has sufficiently alleged a RICO pattern.

### 4. The Remaining RICO Claims

#### a. Mail and Wire Fraud

Mail and wire fraud require "(1) a scheme to defraud, (2) money or property that is the object of the scheme, and (3) use of wires [or mail] to further that scheme." *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 137 (2d Cir. 2018). The scheme to defraud is a

question of a fair and civil exchange (or lack thereof) in business transactions; the monies or

property at the center of the scheme must be the victim's own; and the use of wires or mail must

further the fraudulent scheme "as conceived by the perpetrator at the time." *Bayshore Capital*

*Advisors, LLC v. Creative Wealth Media Finance Corp.*, 667 F.Supp.3d 83, 124-25 (S.D.N.Y.

2023) (internal quotations and citations omitted).  When a plaintiff cites predicate acts of mail

and wire fraud, the complaint must be pled with particularity in accordance with Fed. R. Civ. P.

9(b).  *Campos v. Lavinsky*, 22-CV-1278 (KAM), 2022 U.S. Dist. LEXIS 206208, at *6

(E.D.N.Y. Nov. 14, 2022).

Here, Plaintiffs assert a scheme to defraud Plaintiffs and investors through the familial

enterprise.  Plaintiffs further state that they have lent Defendant Tang nearly $2 million dollars

all in the hopes that the monies would go towards helping Zou or benefiting JLK LLC.  (*See*

ECF No. 33 ¶¶ 47-50, 64, 67).  To carry out her frauds, she used mailed documents, emails, wire

transfers, phones, and cell phones including the WeChat application.  (*Id*. ¶¶ 62-64, 66, 68-69,

72-76.)  Specifically, Plaintiffs allege that the monies were transferred via wire communication

and the forged tax documents were mailed and emailed to their accountants and to the IRS in at

least New York and South Carolina.  (*See id*.); *see also BC Liquidating, LLC*, 519 B.R. at 423

(finding mail and wire fraud alleged where defendant concealed transfers, made

misrepresentations to other people and paid off other defendants to conduct false audits); *see also*

*Ideal Steel Supply Corp. v. Anza*, 02 Civ. 4788 (RMB) (AJP), 2005 U.S. Dist. LEXIS 6781, at

*9-10 (S.D.N.Y. Apr. 18, 2005) (stating that the Second Circuit has found that "mail fraud based

upon the mailing of fraudulent sales tax returns constitutes a predicate act" under RICO.

Examples of the tracking records of funds involved in the fraud have been attached by Plaintiffs'

counsel in ECF No. 82.  Accordingly, the Court finds that mail and wire fraud have been adequately pled.

### b.  Money Laundering

With respect to money laundering, it is an offense to "knowingly conduct or attempt to conduct a financial transaction that involves the proceeds of an unlawful activity with the intent to promote the carrying on of specified unlawful activity."  *BC Liquidating, LLC*, 519 B.R. at 424 (citing 18 U.S.C. § 1956(a)(1)(A)).  In addition, a defendant is also prohibited from "engag[ing] in a financial transaction to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."  *Id*. (citing 18 U.S.C. § 1956(a)(1)(B)(i)).  These allegations need to only be stated in according with Rule 8(a), not Rule 9(b).  *Id*.

Here, similar to the wire and money frauds, Plaintiffs allege that Defendants laundered the ill-gotten gains to purchase real estate properties and further maintained the appearance that the business was not profiting so they could pocket the monies by misrepresenting the information on various tax returns year after year.  (*See* ECF No. 33 ¶¶ 62-63, 66, 68-69, 72-76.) However, Defendants were purportedly pocketing the monies and distributing it amongst themselves and others.

For these reasons, the Court recommends a finding that Plaintiffs have plausibly alleged a predicate act of money laundering.

### c.  Transportation of Stolen Property

18 U.S.C. §§ 2314-2315 prohibits "the interstate or foreign transport of goods valued at $5,000 or more, that have been stolen, converted, or taken by fraud" as well as "the knowing receipt, sale, concealment, possession, or disposition of stolen goods that have been transported

interstate or abroad after being stolen, unlawfully converted, or taken." *Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 75 (E.D.N.Y. 2020); *see also United States v. Portrait of Wally*, 99 Civ. 9940 (MBM), 2002 U.S. Dist. LEXIS 6445, at *39 (S.D.N.Y. Apr. 11, 2002) (stating that the elements for 18 U.S.C. 2314 include: "(1) the transportation in interstate or foreign commerce of property, (2) valued at $ 5,000 or more, (3) with knowledge that the property was stolen, converted or taken by fraud.").

Here, as explained above, Defendant Tang knowingly sent false documents or monies via wire transfer across states and to China through email, mail, wire communication, etc.  The monies were all greater than $5,000 and included those taken from Plaintiffs to benefit Tang. (ECF No. 33 ¶¶ 47-48, 62-64, 66, 68-69, 72-76.)  Accordingly, the undersigned recommends a finding that the transportation of stolen property claims is sufficient.

### 5.  Han's Involvement in the Crimes

Although Defendant Tang's involvement is quite strong from the SAC, Plaintiffs allege allegations as to Han's involvement as less than clear.

For Plaintiffs to prevail on their claims, they must allege, to some extent, Defendant Han's participation in the RICO schemes.  *See Tech. in P'ship v. Rudin*, 10 Civ. 8076 (RPP), 2011 U.S. Dist. LEXIS 114127, at *13-14 (S.D.N.Y. Oct. 3, 2011) (plaintiff failed to satisfy the participation element required for a civil RICO violation and RICO conspiracy so both counts against those defendants were dismissed); *Worldwide Directories, S.A. De C.V. v. Yahoo! Inc.*, 14-cv-7349 (AJN), 2016 U.S. Dist. LEXIS 44265, at *31-32 (S.D.N.Y. Mar. 31, 2016) (finding that plaintiff failed to allege Yahoo's involvement in the RICO enterprise).

Here, Plaintiffs allege that:

- Han received 40% of company shares from Tang and then transferred it back to Tang for consideration (ECF No. 33 ¶ 8);

- Funds were wired from Li to Tang's parents then back to Defendants (*id*. ¶ 47);
- Defendants concocted a plan to sell Carousel Motel behind Zou's back ((*id*. ¶ 52);
- Defendants defrauded Plaintiffs and tax authorities with the misrepresentations on the tax returns ((*id*. ¶ 55);
- Defendants devised a plan to sell Summer Sands unbeknownst to Zou ((*id*. ¶ 60);
- Defendants transferred stolen monies and entered into a real estate deal to use ill-gotten funds to purchase a luxury home in Jericho, New York (*id*. ¶ 62);
- Han sold a property in Tang's name and transferred the property to himself which was financed with ill-gotten funds (*id*. ¶ 66);
- Defendants purchased real estate properties and sold them to legalize the ill-gotten monies (*id*. ¶ 79); and
- Defendants forced Zou to transfer 10% of JLK (*id*. ¶ 80).

The alleged acts were performed *in conjunction* with Tang; in other words, beyond the conclusory allegations that Han pocketed certain monies or defrauded tax authorities or used ill-gotten gains to buy properties, there is nothing specifically indicating Han's involvement in the frauds. Worse for Plaintiffs, the transfer of Tang's shares to Han was legal and therefore not a predicate act. Accordingly, the undersigned recommends dismissal with prejudice of the claims as against Han. *Cf. BC Liquidating, LLC v. Weinstein (In re BC Funding LLC),* 519 B.R. 394, 421 (Bankr. E.D.N.Y. 2014) (finding plaintiff alleged each individual defendant's involvement in the alleged fraud to survive a motion to dismiss).

### 6. Proximate Causation and Subsequent Injury

In addition to pleading the elements for each predicate act, "[a] plaintiff alleging a RICO claim has to show that its injuries were caused by the defendants' racketeering activities." *In re BC Funding, LLC*, 519 B.R. at 427. In other words, "plaintiff must demonstrate that an enterprise's acts of racketeering were a *substantial factor* in the sequence of responsible causation and that the plaintiff's injury was reasonably foreseeable or anticipated as a natural consequence." *Id*. (internal citations omitted) (emphasis added). To establish proximate causation, a plaintiff must further demonstrate a "direct relation between the injury asserted and the injurious conduct alleged." *Martin Hilti Family Trust v. Knoedler Gallery, LLC*, 137 F.

Supp. 3d 430, 474 (S.D.N.Y. 2015).  However, it is insufficient to assert a link that is "too remote, purely contingent, or indirect."  *7 W. 57th St. Realty Co., LLC v. Citigroup, Inc*., 771 Fed. Appx. 498, 504 (2d Cir. 2019).  Notably, for civil RICO claims involving fraud, the plaintiff must establish that he reasonably relied on defendants' misrepresentations or omissions. *Delgado v. Ocwen Loan Servicing, LLC*, No. 13-CV-4427 (NGG) (RML), 2014 U.S. Dist. LEXIS 135758, at *63-64 (E.D.N.Y. Sept. 23, 2014).

For all three types of predicate acts—mail and wire fraud, money laundering, and transportation of stolen property—Plaintiffs allege that Defendant caused significant monetary harm by stealing monies with the representations that they would be paid back and then subsequently legitimizing the ill-gotten funds by purchasing real estate, wiring the monies through several different persons before it finally got to Tang, and misrepresenting the tax losses on various tax returns to avoid repaying Plaintiffs back and making the businesses appear profitable.  (ECF No. 33 ¶¶ 62, 64 66, 68-69, 72-76.)  Evidence of these laundered transactions back to the "ill-gotten gains" have been filed on the docket at ECF No. 82.  Plaintiffs contend that they relied on and believed Defendants' misrepresentations which resulted in their loss of a large sum of hard-earned family savings.  Throughout the course of the fraud, Zou sent Tang a total of $100,000 and Li sent her over $1 million (*id*. ¶¶ 53, 56.)  *Delgado*, 2014 U.S. Dist. LEXIS 135758, at *64-65 (finding causation adequately pled where the complaint detailed what caused plaintiffs to be misled from defendants' solicitation); *cf. 7 W. 57th St. Realty Co., LLC*, 771 Fed. Appx. at 504 (finding that other factors contributed to the decline in portfolio value so the lower court correctly dismissed the RICO claim).  Thus, Plaintiffs have sufficiently pled that Defendants have proximately caused Plaintiffs' monetary injuries.

Accordingly, the undersigned finds that Plaintiffs have sufficiently alleged the existence of an enterprise, the participation by Tang in the enterprise, at least two predicate acts of racketeering for Tang, and sufficient continuity and proximate causation to state RICO claims against Tang. The same cannot be said for Han, however, where Plaintiffs have wholly failed to plead Han's involvement or participation in the alleged frauds.

### 7. Count Two: RICO Conspiracy: 18 U.S.C. § 1962(d)

Defendant Tang asserts that Plaintiffs merely parrot the statute for conspiracy and fail to allege injury and proximate cause. (ECF No. 54-1 at 41.)

To establish a RICO conspiracy under § 1962(d), a plaintiff must show that there was an agreement to violate RICO's substantive provisions. *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244 (2d Cir. 1999) (citing *U.S. v. Sessa*, 125 F.3d 68, 71 (2d Cir. 1997)). Specifically to find conspiratorial intent, courts look for (1) facts implying the existence of an agreement (2) involving each of the defendants (3) to commit two or more predicate acts, (4) as well as facts indicating each defendant understood the enterprise's scope, and (5) was aware the acts were part of a racketeering pattern, continuous and related. *Dornberger v. Metropolitan Life Ins. Co.*, 961 F.Supp. 506, 527 (S.D.N.Y. 1997); *Hecht v Commerce Clearing House, Inc*., 897 F.2d 21, 25-26 (2d Cir. 1990). "[A] defendant's agreement to join a conspiracy can be inferred from circumstantial evidence of the defendant's status in the enterprise or knowledge of wrongdoing." *JP Morgan Chase Bank, N.A. v. Nowak*, No. 23-CV-6834 (JPO), 2024 U.S. Dist. LEXIS 60710, at *16 (S.D.N.Y. Mar. 28, 2024). Notably, "a RICO conspiracy claim will be dismissed where the plaintiff alleges no facts to show specifically that the defendants had any meeting of the minds in the alleged violations." *Campos v. Lavinsky,* No. 22-cv-01278-KAM-LB, 2022 U.S. Dist. LEXIS 206208, at *5 (E.D.N.Y. Nov. 14, 2022)

(quoting *Wolhendler v. Goldberg*, No. 19-CV-0457, 2020 WL 5658790, *2 (E.D.N.Y. Sept. 23, 2020)).

Here, beyond conclusory allegations, blatantly absent from the operative Complaint is any indication of the formation of an agreement. (*See* ECF No. 33 at 60) (stating only that Defendants and family members "agreed that a defendant must commit two predicate acts or agree to participate in the conduct of the enterprise with the knowledge and intent that other members of the conspiracy would commit at least two predicate acts in furtherance of the enterprise"); (*id.* at 61) ("An agreement to [commit several acts of racketeering activity] is beyond doubt."). Moreover, Plaintiffs allege boilerplate language throughout the Complaint in attempting to overcome their pleading deficiencies: "Defendant Tang and Han did knowingly and intentionally conspire to devise a scheme to defraud the plaintiffs and other victims, and to obtain money and property by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purposes of executing such scheme…" (ECF No. 33 ¶¶ 46, 61.); *see Sundahl v. State Farm Mut. Auto. Ins. Co.,* No. 08-CV-1342 (JS)(WDW), 2009 U.S. Dist. LEXIS 68093, at *20 (E.D.N.Y. Mar. 31, 2009) (stating that plaintiffs' RICO conspiracy claim failed for failure to plead a substantive RICO violation and existence of an agreement); *Cheeks v. Fort Myer Constr. Corp.*, 216. F. Supp. 3d 146, 162 (D. D.C. 2016) (finding that plaintiffs failed to allege the existence of an agreement or that the conspiracy caused their injuries because they merely stated that "each defendant agreed that a conspirator would conduct or participate in the affairs of the Enterprise" and the court had no information to infer such a conspiracy from the pleadings); *M'Baye v. N.J. Sports. Prod.,* 06 Civ. 3439 (DC), 2007 U.S. Dist. LEXIS 9101, at *24 (S.D.N.Y. Feb. 7, 2007) ("The failure to allege an agreement is the most basic element of a RICO conspiracy claim, and the lack of such an

allegation is enough for dismissal."); *Paul Hobbs Imps. Inc. v. Verity Wines LLC,* No. 21 Civ. 10597 (JPC), 2023 U.S. Dist. LEXIS 12184, at *54 (S.D.N.Y. Jan. 24, 2023) ("Plaintiffs' Complaint, similarly, contains only a conclusory, boilerplate allegation as to the existence of Defendants' alleged agreement to commit a RICO violation.").  Notably, one can still be involved in a RICO enterprise but not violate the RICO conspiracy statute.  *See Alkhatib v. New York Motor Group LLC*, No. CV-13-2337 ARR, 2015 WL 3507340, at *9-10, 14-17 (E.D.N.Y. 2015) (where a bank was a separate and distinct entity sufficient to qualify as a member of the RICO enterprise, but only fulfilled its ordinary business purposes without knowing or willingly engaging in racketeering activity such that it could not be liable for the RICO claims).

As such, the conclusory allegations standing alone do not state plausible RICO conspiracy claims.  Accordingly, the undersigned recommends dismissal of Plaintiffs' RICO conspiracy claim.  *Cf. Delgado,* 2014 U.S. Dist. LEXIS 135758 at *65-66 (finding conspiracy alleged where the complaint described "Defendants' knowledge of the design and tactics of the conspiracy, their agreement to participate, and their different roles").

###     vi.   State Law Claims[13]

####       1.   Standing for Plaintiff Zou's Derivative State Law Claims

Plaintiff Zou asserts claims derivatively on behalf of JLK LLC.  Specifically, Plaintiff Zou claims that he was injured suffered from Defendants' misconduct.  (ECF No. 33 ¶ 122.)  He claims that he has standing to sue derivatively on JLK's behalf as its "sole founder, rightful

---

[13] The parties agree South Carolina law applies to the state law claims.  (*See* ECF No. 33-1 at 28) (stating that the governing law are those of the state of South Carolina and signed by Zou); (ECF Nos. 54-3 and 54-4) (arguing that the state law claims are time-barred under South Carolina's statute of limitations); *see also Aaronson v. Kellogg Co.,* 18-CV-5616 (SJF) (AKT), 2020 U.S. Dist. LEXIS 85337, at *20 n.3 (E.D.N.Y. May 14, 2020) ("As the parties apparently agree that New York law controls, the court will apply it."); *Anaptyx v. Golf Colony Resort II at Deer Track Hoemowners' Ass'n,* 892 S.E.2d 317, 318 n.2 (S.C. Ct. App. 2023) ("Generally, under South Carolina choice of law principles, if the parties to a contract specify the law under which the contract shall be governed, the court will honor this choice of law.") (internal citations omitted).

owner and/or oppressed shareholder" for having been injured in his business and property. (*Id.* ¶ 18.) He further claims that "[a]ny demand for action from defendants would be futile, unnecessary, including for the reasons identified in the complaint." (*Id*.)

According to South Carolina law, "a member of a limited liability company may only maintain an action against the company or another member or manager to enforce that member's rights under the operating agreement and under South Carolina law. That member's loss must be 'separate and distinct' from that of the company." *Boathouse at Breach Inlet, LLC v. Stoney,* 900 S.E.2d 483, 492 (S.C. Ct. App. 2024) (citing Section 33-44-410 of the South Carolina Code); *see also Brown v. Stewart,* 557 S.E.2d 676, 684 (S.C. Ct. App. 2001) ("A shareholder's suit is derivative if the gravamen of his complaint is an injury to the corporation and not to the individual interest of the shareholder.") (internal citations omitted).

Rule 23 of the South Carolina Rules of Civil Procedure requires that a plaintiff set forth "particularized allegations" as to why making a demand upon the corporation or organization would be futile. *See Adkins v. I'On Co.,* 889 S.E.2d 537, 547 (S.C. 2023); *see also* S.C. R. Civ. P. 23 (stating that for derivative actions, the complaint must allege that the plaintiff was a shareholder or member at the time of the transaction(s) or his shares or memberships were devolved). Specifically, the demand must identify the wrongdoers, describe the acts and harm upon the company, and request relief. *Adkins*, 889 S.E.2d at 548; *see also Mvp Grp. Int'l v. Meece,* 2021 S.C. C.P. LEXIS 2471, at *4 (Ct. of C.P. S.C. Aug. 23, 2021) (applying particularity requirement to LLCs).

Here, Plaintiff Zou was *both* directly and derivatively harmed by Defendant Tang's actions. Zou lent monies to Defendant Tang for investment into the company. However, Tang's misuse of funds in turn led to losses for the company since the money was not being used for

company purposes or creating income. Therefore, it seems that Plaintiff does have standing to pursue his state law claims based on these acts. *Boathouse at Breach Inlet, LLC,* 900 S.E.2d at 493 (finding that movant did not have standing to bring his derivative action claim since he alleged financial losses to the company, as opposed to solely his own interest, as well as a breach of another member's fiduciary duty to the company). However, Plaintiff's derivative claims fail because he has not stated with particularity what demands, if any, he has made on Defendants and why they would be futile or otherwise unnecessary. (*See* ECF No. 33 ¶ 151) ("Reasonable demands were made, but defendant refused to return the fruits of their acts of thefts.") Accordingly, all *derivative* claims against Defendants on JLK's behalf, should be dismissed.[14]

## 2.   Statute of Limitation for the State Law Claims

Again, before diving into the substance of the state law claims, the undersigned analyzes whether these claims were made timely.

South Carolina applies a three-year statute of limitation period for Plaintiffs' state law claims of conversion, common law fraud, breach of fiduciary duty, and unjust enrichment. *See* S.C. Code Ann. § 15-3-530(4)-(5), (7) (Supp. 2003); *see also Hughes v. Bank of Am. Nat'l Ass'n.,* 2017- CP-42-02834, 2018 S.C. C.P. LEXIS 4672, at *11-12 (May 19, 2018); Michael Sullivan, Douglas S. MacGregor, *Elements of Civil Causes of Action § 43.D* (2015) (stating that there is a three year statute of limitation for an unjust enrichment claim) (citing *Graham v. Welch,* 743 S.E.2d 860 (S.C. Ct. App. 2013)). The statute of limitations will begin to run "from the date the claim[ant] knew or should have known that, by the exercise of his reasonable diligence, a cause of action exists." *Holmes v. Nat'l Serv. Indus., Inc.,* 717 S.E.2d 751, 753 (S.C. 2011); *see also Church of God v. Estes,* No. 2018-UP-030, 2018 S.C. App. Unpub. LEXIS 30, at

---

[14] Additionally weighing against Plaintiff Zou is the fact that Defendant Tang alleges that all members agreed to have Zou divest his membership since he failed to contribute any capital in 2015. (*See* ECF No. 54-4 at 2.) His interests were then reassigned back to him by Tang. (*Id.*)

*7 (S.C. Ct. App. Jan. 17, 2018) (collecting cases that have adopted the discovery rules which means that the statute of limitations begins to accrue once the action should have been discovered).

As with the claims above, the Court finds that the allegations surrounding the Summer Sands and Carousel Motel transactions are untimely, given that Plaintiffs could have discovered these frauds by looking at the relevant documentation.  (*See e.g.* ECF No. 33-4) (Warranty Deed for Carousel Motel dated September 22, 2016.)  Additionally, like the claims above, the Court finds that the date concerning the other frauds did not expire given that they could not have discovered them sooner.  The Court next looks to the merits of Plaintiffs' state law claims.

### 3.  Count Three: Common-Law Fraud

Plaintiffs allege that Defendants engaged in wrongful acts that have caused them injuries by using Defendants' family members as bait to have him contribute 50% of the funds for Summer Sands and lie about its purchase price; forging Zou's signatures; falsifying business records; and selling Carousel Motel.  (ECF No. 33 ¶ 126.)  As a result of Defendants' actions, Plaintiff's membership interest in JLK will suffer in value and Plaintiffs have already lost a large sum of their family savings by relying on Defendants.  (*Id.* ¶¶128-29.)

To prevail on a claim for common-law fraud in South Carolina, a plaintiff must prove the following elements:

 (1) a representation of fact; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury. The failure to prove any element of fraud or misrepresentation is fatal to the claim.

*Schnellmann v. Roettger*, 645 S.E.2d 239, 241 (S.C. 2007). These elements must be proven by "clear, cogent, and convincing evidence." *Ben. Fin. I, Inc. v. Windham,* 847 S.E.2d 793, 801 (S.C. Ct. App. 2020).

Aside from the Summer Sands and Carousel Motel transactions, the undersigned concludes that Plaintiffs do state a plausible claim for fraud for the other alleged incidents. Plaintiffs allege that time-and-time again Defendant Tang stated the monies lent to her would go either towards the benefit of the company or to Zou or that they would be paid back once the business was once again profiting. (*See e.g.,* ECF No. 33 ¶¶ 64, 67.) Plaintiffs relied on Defendants' statements, by injecting money into Tang's bank accounts or into JLK, hoping business would become booming once again or they would recover their savings. Plaintiffs were unaware of the falsity of Tang's promises, having been shut out of JLK's books and having not seen JLK become profitable since Tang handled the tax returns. Accordingly, the undersigned recommends denying Defendants' motion to dismiss the common law fraud claim.

### 4.  Count Four: Breach of Contract/Promises

Plaintiffs allege that Defendants breached the Operating Agreement by excluding Plaintiffs from a managing position; failed to provide books and records of cash incomes and access to such records; failed to pay dividends; falsely reported business losses and expenses; forged Zou's signature; falsified JLK records; sold the business and kept the proceeds; and finally, usurped and diverted JLK incomes by entering into contracts with Harrar. (ECF No. 33 ¶ 134.)

To prevail on a breach of contract claim, a plaintiff must establish that there was a contract created by an offer, acceptance, and valuable consideration; that the contract's terms were breached; and that the breach caused him damages. *Manios v. Nelson, Mullins, Riley &*

*Scarborough, LLP,* 697 S.E.2d 644, 654 (S.C. Ct. App. 2010); *Consignment Sales, LLC v. Tucker Oil Co.*, 705 S.E.2d 73, 76 (S.C. Ct. App. 2010).

Here, all of Plaintiffs' allegations under this claim flow from the breach of the Operating Agreement—that is, they result from Plaintiff Zou's derivative claim. The undersigned has already recommended dismissal of Plaintiff's derivative claim and Plaintiffs have not otherwise demonstrated the existence of a contract with Defendants sufficient to support their breach of contract claims. Accordingly, this claim should be dismissed.

### 5. Count Five: Conversion

Plaintiffs claim that Defendants have taken JLK's cash incomes, lied about the purchase prices of the Summer Sands Motel, and falsely created business losses which were reported to the IRS. (ECF No. 33 at 65-66.)

Under South Carolina law, conversion occurs when one assumes and exercises ownership rights over goods or property that rightfully belongs to another, resulting in the alteration or exclusion of the owner's rights. *Moore v. Weinberg,* 644 S.E.2d 740, 749 (S.C. Ct. App. 2007). Conversion "may arise by some illegal use or misuse, or by illegal detention of another's personal property." *Id.* (citations omitted). Further, a plaintiff can prevail on a conversion claim by showing that defendant continued to detain his property even after a demand. *Id.* To succeed, Plaintiff must prove he had title or right to possession of the property at the time of the conversion. *Richardson's Rests. V. Nat'l Bank of S.C.,* 403 S.E.2d 669, 672 (S.C. Ct. App. 1991). Notably, money cannot be used on a claim for conversion "unless there is an obligation on the defendant to deliver a specific, identifiable fund to the plaintiff." *Id.*

Here, according to the Complaint, Tang has misused both Plaintiffs' loaned monies to buy personal property. (ECF No. 33 ¶ 62) (stating that Defendants and enterprise members used

funds to purchase a home in Jericho, New York in Han's name).  The Complaint also states that Plaintiffs made reasonable demands upon Defendants to return the monies, but Defendants have refused.  (*Id.* ¶ 142.)  Given that the undersigned has recommended dismissal of the derivative claims and the claims related to the Summer Sands and Carousel transactions, the Court finds that with respect to the monies owed to Plaintiffs alone, there was an obligation on Defendant Tang to deliver the specified funds back to them.  (*See e.*g., ECF No. ¶ 130) ("Co-plaintiff Chunlan Li was promised by defendants that her funds would be a loan to be paid back to her as soon as the motel becomes profitable or upon the successful sale of a reasonable market price….")  Accordingly, Plaintiff states a plausible claim for conversion for the monies loaned to Defendant and Defendant's motion to dismiss this claim should be denied.  *See Causey v. Blanton,* 314 S.E.2d 346, 348 (S.C. Ct. App. 1984) (finding sufficient evidence that defendant refused to surrender possession even after plaintiff demanded it).

### 6.  Count Six: Unjust Enrichment

Finally, as to unjust enrichment, Plaintiffs allege that Defendants lied about the Summer Sands purchase price, forged Zou's signature to sell Carousel, and usurped business from JLK by entering separate contracts.  (ECF No. 33 ¶ 148.)  In order for a plaintiff to succeed on an unjust enrichment claim, he must demonstrate that "(1) he conferred a benefit on the defendant; (2) the defendant realized that benefit; and (3) it would be inequitable to allow the defendant to retain the benefit without compensating the plaintiff for its value."  *Jessica S. Cook v. S.C. Pub. Serv. Auth.,* 2017-CP-25-348, 2019 S.C. C.P. LEXIS 7830, at *6 (Ct. of C.P. S.C. May 7, 2019); *see also Curry v. Manigault,* No. 2006-UP-377, 2006 S.C. App. Unpub. LEXIS 275, at *5 (S.C. Ct. App. Nov. 21, 2006) (same).

Defendant Tang was inappropriately enriched by Plaintiffs' loans because Tang would often receive monies from Plaintiffs who were under the presumption that the funds would be put towards JLK LLC; however, Tang simply pocketed the monies for herself. (*See e.g.,* ECF No. 33 ¶¶ 46-50, 70) (stating that Tang kept nearly $2.5 million in loan monies or proceeds from sales for herself). Further, Tang realized the benefit by using the loan monies to purchase real estate properties (ECF No. 33 ¶ 79.) Neither Plaintiff received a benefit from their loans to Defendant Tang. (ECF No. 33 ¶ 53) (stating that Tang and Han did not "pay[] a penny to Kenn Zou or [his] mother co-plaintiff Chunlan Li who contributed about $1 million dollar[s] as a loan"); *see Jessica S. Cook*, 2019 S.C. C.P. LEXIS 7830, at *6 (finding that the complaint stated a cause of action for unjust enrichment where plaintiffs conferred a benefit upon defendants, defendants realized the benefit of such monies, and it would be unjust to allow them to retain the funds). Thus, the motion to dismiss Count Six should be denied.

### 7.  Count Seven: Breach of Fiduciary Duty

Plaintiffs claim there was a breach of a fiduciary duty given Defendants' lies about the purchase price of the Summer Sands Motel, the forging of Zou's signature and subsequent selling of Carousel Motel, the tax frauds, the withholding of JLK LLC's and personal incomes, the exclusion of Zou to company records, and the alleged competition with Plaintiffs for operating a competing business which have all caused harm to Plaintiffs. (ECF No. 33 at 67-69.)

To prevail on a claim for fiduciary duty, the plaintiff must prove: (1) the existence of a fiduciary duty; (2) a breach of that duty; and (3) damages flowing from defendant's wrongful conduct. *RFT Mgmt. Co., L.L.C. v. Tinsley & Adams L.L.P.,* 732 S.E.2d 166, 173 (S.C. Ct. App. 2012). Such a relationship triggering a fiduciary duty exists "when one imposes a special confidence in another, so that the latter, in equity and good conscience is bounce to act in good

faith and with due regard to the interests of the one imposing the confidence." *Id.* (noting the attorney-client relationship qualifies as a fiduciary relationship); *see also Turpin v. Lowther,* 745 S.E.2d 397, 401 (S.C. Ct. App. 2013) (noting that the personal representative of an estate is a fiduciary); *Hoyt v. CollaborativeMed, LLC,* No. 2018-UP-093, 2018 S.C. App. Unpub. LEXIS 93, at *9-10 (S.C. Ct. App. Feb. 21, 2018) (finding no dispute regarding whether a director of a company owed a fiduciary duty to plaintiff).  Otherwise,

> To establish the existence of a fiduciary relationship, the facts and circumstances must indicate the party reposing trust in another has some foundation for believing the one so entrusted will not act in its own behalf but in the interest of the party so reposing. The evidence must show the entrusted party actually accepted or induced the confidence placed in it.

*Anderson Cty. v. Preston,* No. 5490, 2017 S.C. App. LEXIS 82, at *13 (S.C. Ct. App. Aug. 16, 2017) (internal citations omitted).

Here, the SAC does not describe the duty owed to Plaintiffs but rather only states in a conclusory manner that "Defendants owed a fiduciary duty to Plaintiffs to discharge their duties and exercise rights related to JLK Holdings INT LLC consistently with the obligation of good faith and fair dealing."  (ECF No. 33 at 67.)  However, Plaintiffs arguably placed confidence in Defendant Tang to fulfill her promises in repaying the loans owed to them, as discussed in the common law fraud section *supra*.  Further, Li does not understand English, which is evident from the fact that the operative Complaint had to be translated for Li.[15]  (*Id*. at 74.)

---

[15] Notably, the operating agreement for JLK states the following on fiduciary duties:

> Each Member shall discharge his duties and exercise any of his rights consistently with the obligation of good faith and fair dealing which he owes to the Company and the other Members. A Member does not violate a duty or obligation to the Company merely because the Member's conduct furthers the Member's own interest. A Member may lend money to and transact other business with the Company. As to each loan or transaction, the rights and obligations of the Member are the same as those of a Person who is not a member, subject to other applicable law.

(ECF No. 53-4 at 14-15.)  This means that the operating agreement placed upon Defendant Tang a duty to act in a fiduciary manner regarding her capacity as a member-shareholder of JLK.  Accordingly, if the

Defendant Tang subsequently breached her duty to Plaintiffs by using the loaned monies

for personal use such as to purchase real estate property.  As a result, Plaintiffs were never repaid

for the monies sent to Tang.  Accordingly, the undersigned recommends denying Defendants'

request to dismiss the breach of fiduciary duty claim.  *Cf. Wilson v. Gandis,* 844 S.E.2d 631, 647

(S.C. 2020) (finding that defendants lacked standing to bring fiduciary counterclaims against

plaintiff where the claims, including misappropriating trade secrets, destroying evidence on

company property, and usurping business opportunities, would have only affected the company

derivatively and not individually).[16]

### vii.  Motions to Strike

### 1.  Diversity Allegations

Defendant Tang alleges that the operative complaint does not sufficiently allege diversity

of citizenship since Plaintiffs fail to allege the citizenship of each party and the LLC and instead

only alleges the residence of the parties.  (ECF No. 45-1 at 45.)  The LLC's members are Zou,

Tang, and Han.  Both Plaintiff Li and Defendant Han reside in New York while Tang and Zou

reside in South Carolina.  This essentially means that the Plaintiffs are not diverse from the

Defendants.  (*Id.*)

The Complaint alleges that "This Court has jurisdiction over the subject matter of this

action and the parties, under 28 U.S.C. § 1332 ("Diversity jurisdiction"), in that the amount in

controversy exceeds $75,000 and parties are of different citizenships of different states."  (ECF

---

District Judge finds that the derivative claim can proceed, then Defendant Tang has blatantly disregarded
her express fiduciary duty to Zou based upon her failure to invest the loan into JLK and her competing
with JLK.

[16] The Court does not address Plaintiffs' last cause of action for declaratory judgment and injunctive relief
as courts in this Circuit have stated that these are not to be treated as separate causes of action.  *See JM
Enters. V. McDonald,* 11-cv-5098 (ADS)(ETB), 2012 U.S. Dist. LEXIS 138599, at *58 (E.D.N.Y. Sept.
25, 2012); *Dreambuilder Invs., LLC v. MERSCORP Holdings, Inc*., 19 Civ. 8937 (ER), 2022 U.S. Dist.
LEXIS 36141, at *16 (S.D.N.Y. Feb. 28, 2022).  Accordingly, this cause of action should be dismissed.

No. 33 ¶ 2.)  It further notes that the Court has jurisdiction considering the alleged RICO acts. (*Id.* ¶ 3.)

Federal district courts have a duty to examine whether federal subject matter jurisdiction exists and must dismiss a case if the jurisdictional predicate is lacking.  *See Sprout Mortg., LLC v. Consol. Analytics*, No. 21-cv-04415 (JMA) (JMW), 2021 U.S. Dist. LEXIS 156152 (E.D.N.Y. Aug. 17, 2021).  Diversity jurisdiction pursuant to 28 U.S.C. § 1332 exists when all plaintiffs are citizens of states diverse from those of all defendants.  *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Morgan Stanley & Co., Inc.*, 772 F.3d 111, 117-18 (2d Cir. 2014) (citing *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 553 (2005)).  The citizenship of a limited liability company (LLC) is determined by the citizenship of each of its members. S*ee, e.g., Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012); *Handelsman v. Bedford Vill. Assocs. Ltd Pship*, 213 F.3d 48, 5152 (2d Cir. 2000); *White v. Abney*, No. 17-CV-4286 (MKB), 2019 WL 1298452, at *3 (E.D.N.Y. Mar. 21, 2019).  A complaint premised upon diversity of citizenship must allege the citizenship of natural persons who are members of a limited liability company and the place of incorporation and principal place of business of any corporate entities who are members of the limited liability company. *New Millennium Capital Partners, III, LLC v. Juniper Grp. Inc.*, 10 Civ. 46(PKC), 2010 WL 1257325, at *1 (S.D.N.Y. Mar. 26, 2010).  For diversity purposes, LLCs have the imputed citizenship of each of their members. *Barnes v. Fort Hamilton Fam. Homes*, No. 21-cv-1044, Case 2:22-cv-01702-DRH-JMW, 2021 WL 861801, at *1 (E.D.N.Y. March 8, 2021).

Here, the complaint alleges causes of action under RICO.  "Diversity of citizenship is not a prerequisite…to this Court's subject-matter jurisdiction over civil RICO claims." *Weaver v. James*, No. 10 Civ. 6609 (NRB), 2011 U.S. Dist. LEXIS 109960, at *4 (S.D.N.Y. Sept. 27,

2011).  Defendant Tang fails to recognize that Plaintiffs' RICO claims correctly place them in federal court.  The RICO claims are the federal subject matter jurisdiction basis.  However, given that Tang and Zou are from South Carolina and Han and Li are from New York—that is, diversity does not exist—Plaintiffs' motion to strike the diversity allegation in ECF No. 33 ¶ 2 should be granted.

### 2.  Punitive Damages Claims

Defendant Tang moves to strike Plaintiff's claim for punitive damages as this is not an available remedy for civil RICO claims.  (ECF No. 54-1 at 46.)

Punitive damages are not available if a plaintiff already received treble damages under a given RICO statute because it would then result in a double recovery and may not pass constitutional muster.  *Lukaszuk v. Sudeen,* CV 02-5143 (JG)(MDG), 2007 U.S. Dist. LEXIS 95919, at *26 (E.D.N.Y. Nov. 27, 2007).

Since Plaintiffs cannot seek punitive damages if they prevail under a RICO statute, Defendants' motion to strike the punitive damages allegations should be granted at this stage.

### B.    Motion to Amend
####     a.  The Legal Context for Motions to Amend Generally

Motions to amend pleadings are governed by Federal Rule of Civil Procedure 15(a). Rule 15(a)(2) provides that "[t]he court shall freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Generally, "[u]nless there is a showing of bad faith, undue delay, futility or undue prejudice to the non-moving parties, the district court should grant leave to amend."  *Adlife Mktg. & Communs Co. v. Best Yet Mkt., Inc*., No. 17-CV-02987 (ADS) (ARL), 2018 WL 4568801, at *1 (E.D.N.Y. Sept. 24, 2018) (citing *Forman v. Davis*, 371 U.S. 178, 182 (1962)).

The party opposing the proposed amended pleading has the burden of establishing that amendment would be prejudicial or futile. *Jipeng Du v. Wan Sang Chow*, No. 18-CV-01692 (ADS) (AKT), 2019 WL 3767536, at *4 (E.D.N.Y. Aug. 9, 2019) (internal quotations and citations omitted). The moving party must attach the proposed amended complaint to the motion, as was done here, specifying the new claims and/or parties intended to be added. *See Nabatkhorian v. County of Nassau*, No. 12-CV-1118 (JS) (GRB), 2012 WL 13113646, at *1 (E.D.N.Y. Aug. 9, 2012).

The Second Circuit has clarified the standard District Courts should apply in considering motions for leave to amend dependent upon the timing of the proposed amendment:

> The ability of a plaintiff to amend the complaint is governed by Rules 15 and 16 of the Federal Rules of Civil Procedure which, when read together, set forth three standards for amending pleadings that depend on when the amendment is sought. At the outset of the litigation, a plaintiff may freely amend her pleadings pursuant to Rule 15(a)(1) as of right without court permission. After that period ends— either upon expiration of a specified period in a scheduling order or upon expiration of the default period set forth in Rule 15(a)(1)(A)—the plaintiff must move the court for leave to amend, but the court should grant such leave "freely . . . when justice so requires" pursuant to Rule 15(a)(2). This is a "liberal" and "permissive" standard, and the only "grounds on which denial of leave to amend has long been held proper" are upon a showing of "undue delay, bad faith, dilatory motive, [or] futility." The period of "liberal" amendment ends if the district court issues a scheduling order setting a date after which no amendment will be permitted. It is still possible for the plaintiff to amend the complaint after such a deadline, but the plaintiff may do so only up [to] a showing of the "good cause" that is required to modify a scheduling order under Rule 16(b)(4).

*Sacerdote v. NYU*, 9 F.4th 95, 115 (2d Cir. 2021); *Johnson v. Barnett Outdoors, LLC*, No. 21-CV-6311 (MJP), 2023 U.S. Dist. LEXIS 208011, at *4 (W.D.N.Y. Nov. 20, 2023) (stating that Rule 15(a)'s standard must be balanced with Rule 16(b)'s good cause standard).

To this end, under Rule 16(b), "good cause" is required to modify a scheduling order implemented by the Court. Fed. R. Civ. P. 16(b)(4); *Sacerdote,* 9 F.4th at 115 ("[T]he period of 'liberal' amendment ends if the district court issues a scheduling order setting a date after which no amendment will be permitted. It is still possible for the plaintiff to amend the complaint after

75

such a deadline, but the plaintiff may do so only up a showing of the 'good cause' that is required to modify a scheduling order under Rule 16(b)(4)")." "[A] finding of 'good cause' depends on the diligence of the moving party." *Parker v. Columbia Pictures Indus*., 204 F.3d 326, 340 (2d Cir. 2000).  Under this lens that the Court reviews Plaintiffs' motion to amend.

### b.  Application

Plaintiffs have added over 50 pages to the newly proposed complaint.  (*See generally* ECF No. 53-3.)  Plaintiffs add more language surrounding the alleged RICO acts and additional RICO claims including claims pursuant to 18 U.S.C. §§ 1962(a) and (b).  (*Id*. at 114-20.)

Defendants do not argue that Plaintiffs were tardy in bringing this motion—rather, they argue that the amendment would cause undue prejudice, be futile, and that Plaintiffs seek to amend their complaint in bad faith by lodging state law claims fashioned as RICO claims.  (ECF No. 54-1.)  Specifically, Defendants state there is no jurisdiction for the claims and the deficiencies present in the original and first amended complaints continue to plague the SAC and TAC, and finally that Plaintiffs have introduced false claims.

### i.  Bad Faith

Here, Defendant Tang states that "Plaintiffs are in bad faith in attempting in procrustean fashion to make a state law dispute fit RICO requirements and create jurisdiction which the Court would otherwise not have."  (ECF No. 54-1 at 47.)  To support its proposition, Defendant points to *Lee v. Ne. Illinois Reg'l Commuter R.R. Corp.,* 912 F.3d 1049, 1052-53 (7th Cir. 2019).  However, the cited pages refer to the *Lee* court's rationale for denying plaintiffs' motion for leave to amend—namely because they failed to cure the deficiencies even after being giving multiple opportunities to correct them.  *Id.*  In another cited case, *CogniTest Corp. v. Riverside*

*Pub. Co.,* 107 F.3d 493, 499 (7th Cir. 1997), the court cited to cases which denied motions for leave to amend for "repeated failure to cure previous deficiencies." Finally, in *Mourad v. Marathon Petroleum Co. LP,* 654 F. App'x. 792, 801 (6th Cir. 2016), the court noted that the district court did not abuse its discretion in denying the motion for leave to amend given that plaintiff failed to cure the pleading deficiencies. In other words, Defendant does not cite to, nor has the Court found, any decisions demonstrating any support for a finding that Plaintiffs engaged in bad faith conduct.

### ii.  Undue Prejudice

Defendant Tang alleges two instances of prejudice here: (1) Plaintiffs allege that Zou's assignment of his 10% shares in JLK was a loan. However, evidence from the South Carolina complaint demonstrates that the assignment was a *sale*, since Tang's payment of $100,000 to Zou occurred after the membership interest assignment; and (2) that she will have great difficulty in locating documents from 2015 to support her defenses. (ECF No. 54-1 at 53-54.)

"Prejudice to the opposing party is the most important factor in considering leave to amend." *Chenensky v. New York Life Ins. Co*., 07 Civ. 11504 (WHP), 2009 U.S. Dist. LEXIS 148696, at *2 (S.D.N.Y. Sept. 1, 2009) (citing *Ruotolo v. City of N.Y*., 514 F.3d 184, 191 (2d Cir. 2008)). An example of prejudice is when the amendment is sought after discovery has closed or will "significantly increase the scope of discovery when the case is ready for trial." *Berman v. Parco*, 986 F. Supp. 195, 217 (S.D.N.Y. 1997) (quoting *Priestley v. American Airlines, Inc*., 89 Civ. 8265, 1991 U.S. Dist. LEXIS 4804, 1991 WL 64459 at *2 (S.D.N.Y. April 12, 1991)); *see also Viruet v. Citizen Advice Bureau*, 01 Civ. 4595 (AJP), 2002 U.S. Dist. LEXIS 15045, at *85 (S.D.N.Y. Aug. 15, 2002) ("Prejudice may be found for example, when the amendment is sought after discovery has been closed.") (internal citations omitted); *Perez v. Escobar Constr., Inc*.,

342 F.R.D. 378, 382 (S.D.N.Y. 2022) (stating that a litigant can be prejudiced if the nonmovant would have to expend more resources to conduct discovery; there would be a significant delay to resolve the suit; or plaintiff would be unable to bring a timely action in another jurisdiction).

Here, the Court finds that Plaintiffs' additions to the operative complaint will not unduly prejudice Defendant. The new facts alleged do not alter the scope of the claims—especially given that Plaintiffs have already alleged Defendants engaged in misconduct dating back to 2015 in the operative complaint. (*See e.g.*, ECF No. 33 ¶¶ 40, 42, 44); *Perez*, 342 F.R.D. at 382 (finding that defendants failed to demonstrate how they would be prejudiced by the amendment since they never explained what further discovery was needed and why they were not already on notice of what the new allegations were). Further, this case is still in its relatively nascent stages, with fact discovery to conclude on September 27, 2024. (*See* Electronic Order dated June 18, 2024.)

Accordingly, the undersigned does not find any undue prejudice.

### iii.  Futility

The Court finally reviews whether the proposed amendments would be futile.

### 1.  Tolling of the Statute of Limitations

The proposed complaint contains a single line regarding Plaintiffs' request to toll the statute of limitations. (*See* ECF No. 53-3 at 21) (stating that the statute of limitations should be tolled since defendants have "wrongfully concealed material facts relating to the[ir] wrongdoings" which prevents them from discovering the nature of their claims).

Equitable tolling is only applied in "rare and exceptional circumstances," in which a party was prevented "from timely performing a required act," and that "party acted with reasonable diligence throughout the period" sought to be tolled. *Walker v. Jastremski*, 430 F.3d 560, 564

(2d Cir. 2005) (citation omitted); *see also Shetiwy v. Midland Credit Management,* 980 F. Supp. 2d 461, 474 (S.D.N.Y. 2013) (stating that tolling occurs in "extraordinary circumstances" such as when the defendant conceals from a plaintiff "the existence of his cause of action;" he was ignorant about the cause of action throughout the statutory period; and his ignorance was not based on lack of diligence).

"When considering a plaintiff's diligence, "the issue is not whether plaintiff was in possession of all of the information necessary to prevail on his claims, but whether plaintiff had enough information to commence a lawsuit." *Statler v. Dell, Inc.,* 841 F. Supp. 2d 642, 647 (E.D.N.Y. 2012) (citing *Torre v. Columbia Univ.*, 97 Civ. 0981 (LAP), 1998 WL 386438, at *8 (S.D.N.Y. July 8, 1998)).

Here, tolling the statute of limitations is unwarranted. Plaintiff Zou could have and should have discovered the fraud with reasonable diligence and checking on the books and records of the company in which he had an ownership interest. The proposed complaint merely states that Defendants have hidden "any and all taxes documents, tax returns, balance sheets, and all related books and financial records, bank accounts information, membership interests transfers, records/ documents, etc., from the two plaintiffs year after year, from 2016 till 2023." (ECF No. 53-3 at 20-21.) Further, Plaintiffs insert boilerplate language sixteen times throughout the proposed complaint stating: "The above also proved that the defendants made efforts, continued to fraudulently conceal the truth from the plaintiffs, for the plaintiffs not to able to discover their injury from defendant's pattern of racketeering activities, despite plaintiffs' due diligence and inquires." (*See id. passim*.) However, none of these statements fully describe how Defendants prevented Plaintiffs from inspecting the books and records or otherwise discovering the alleged frauds sufficient to toll the limitations period. *See Paige v. Magnum Hunter Res.*

*Corp. (In re Magnum Hunter Res. Corp. Sec. Litig.)*, 616 Fed. Appx. 442, 447 (2d Cir. 2015) (stating that courts never permit the tolling of statute of limitations "until a company's disclosures touch on every specific allegation that a plaintiff chooses to put in his complaint" and finding that the movant had long known about its claims and thus failed to demonstrate diligence or extraordinary circumstances for tolling purposes). Accordingly, the statute of limitations should not be tolled. Further, and as discussed above, the Court finds that the statute of limitations period has expired for the Summer Sands and Carousel Motel transactions since they could have checked the contract documents in the respective years, but that the limitations period has not expired with respect to the other individual claims.

### 2. Whether Plaintiffs Cured the Deficiencies from the Prior Complaint

This leads to the next question, that is: does the amended pleading cure the deficiencies noted above? The Court notes the following:

1.   Plaintiffs have still failed to state an injury for the immigration fraud allegations and Li still has not established an injury for the tax fraud claims. Plaintiffs make vague allegations that Defendants asked Plaintiffs to use their Chinese connections for Defendants to gain more investors for their immigration fraud. (ECF No. 53-3 ¶¶ 18, 106.) However, there is no indication that Plaintiffs actually provided Defendants with potential investors' contact information. Nonetheless, there is no indication they were harmed.

2.   With respect to the statute of limitations, Plaintiffs still have not alleged why they could not have discovered the fraud sooner around the Summer Sands and Carousel Motel transactions. (ECF No. 53-3 at 20.)

3.   As to the conflict of interest/derivative claims, Plaintiffs state the following:

> Plaintiff Zou, derivatively as a shareholder on behalf of JLK LLC, has standing, who sustained injury to its business or property, by reason of defendant's violation of § 1962. A demand upon the only other member defendant Jun Tang of JLK LLC or her son Xiao Han, (co-defendant Xiao Han allegedly has "sold" his 40% membership interests to his mother Jun Tang, subject to further discovery), would be futile. See Fed. R. Civ. P. 23.1; *Lewis v. Graves*, 701 F.2d 245, 248 (2d Cir. 1983). Defendant Tang

> has orchestrated and committed the challenged conducts. *With reasonable certainty, it is fair to assume that defendant Tang would not have agreed to initiate a lawsuit accusing herself or her son of wide-ranging wrongdoing, including RICO violations. Indeed, Tang has repeatedly taken steps/motions to dismiss this action after its commencement.*

(ECF No. 53-3 ¶ 38) (emphasis added). From the italicized statement, Plaintiffs clearly have not made a demand upon either Defendant but instead have assumed that Tang would not have agreed to initiate the suit. Plaintiffs have not satisfied their burden in establishing that making a demand would have been futile because they have not shown "with particularity" that "(a) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; *and* (b) the reasons for not obtaining the action or not making the effort." *Rahbari v. Oros* 732 F. Supp. 2d 367, 376 (S.D.N.Y. 2010) (citing Fed. R. Civ. P. 23.1(b)(3)). And, in looking to the applicable state court's law on this issue of futility[17], here—South Carolina, the Court additionally finds that Plaintiffs have not pled "with particularity the *exceptional circumstances* that demonstrate why making a demand would be futile." *Adkins v. I'On Co.*, 439 S.C. 568, 588 (S.C. 2023).

4.    Plaintiffs still have not cured the deficiencies with respect to the diversity allegation and claim for punitive damages. Therefore, these statements should remain stricken.

5.    As to the breach of contract claim, Plaintiffs have not stated anything beyond the contract formed with Tang concerning JLK. This would be better suited in a derivative suit.

6.    Plaintiffs have also added a witness tampering violation for Defendant Tang's statement to Li that she would deny Li's loaning $600,000. (ECF No. 53-3 ¶ 27.) However, Plaintiffs have not demonstrated that this was a threat or intimidation that ultimately prevented Li from filing suit or eventually testifying. Given the speculative, and conclusory, nature of Plaintiffs' allegation, this predicate act should be stricken. *See* 18 U.S.C. § 1512(b)(1) (punishing those who "knowingly use[] intimidation or physical force, threaten[], or corruptly persuade[] another person, or attempt[] to do so, or engage[] in misleading conduct toward another person with intent to influence, delay, or prevent the testimony of any person in an official proceeding.").

7.    Han's involvement remains less than clear in the proposed complaint. Therefore, his motion to dismiss the claims against him in the proposed complaint should be granted.

---

[17] *Halpert Enterprises, Inc. v. Harrison*, 362 F.Supp.2d 426, 430 (S.D.N.Y. 2005) ("The relevant substantive law on demands is that of the state where the corporation is incorporated.").

### 3.   Merits of the Newly Added Facts and Causes of Action

As to the merits of the new facts, Plaintiffs state that the newly proposed complaint resolves all deficiencies brought forth by Defendant Tang in her pre-motion letter to dismiss the operative complaint.  (ECF No. 53-1 at 7.)   Defendant Tang in turn states that Plaintiffs have failed to correct the deficiencies present from their original complaint.  (ECF No. 54-1 at 48.)

Among the new facts presented are: *first,* around October 2020 and October 2022 Defendants conspired together to "transport, transmit, or transfer[]" items they knew were stolen—namely they bought a 2020 Cadillac vehicle worth approximately $75,000.  (ECF No. 53-1 at 8-9.)  Additionally, Defendant Tang used stolen monies from Plaintiff Li to buy a 2023 Volkswagen SUV worth approximately $50,000 although the hotel business was allegedly not profiting.  (*Id.* at 9.) And finally, a mini-Cooper was purchased using stolen funds which caused Plaintiffs injury.  (*Id.*)  *Second,* around December 2023, Defendants conspired to defraud Plaintiffs by transferring knowingly fraudulent documents—namely doing this to sell Summer Sands at a 40% discounted price to Harrars Holding LLC in exchange for business with Harrars and kick-backs.  (*Id.* at 10-11.)  Defendants allegedly caused Summer Sands to be auctioned off by the County Property Tax Receiver by not paying the property taxes owed.  (*Id.*)  Tang promised Plaintiffs she would pay more than half of the tax lien to avoid the auction from proceeding and asked Plaintiff to cover the rest.  (*Id.*)  Plaintiffs paid their portion of the tax lien, but Defendants did not.  (*Id.* at 12.)  Recognizing that Defendant Tang would not pay her half, Plaintiffs ended up paying the full amount of the lien to prevent the auction from occurring.  (*Id.*)  Plaintiffs are convinced this was all part of Defendant Tang's plan to have Plaintiffs pay and ignore them until the eleventh hour before the auction was to take place.  (*Id.*)  *Finally*, beginning around June 2016 until the present, Defendants and other enterprise members

conspired to profit from green card programs, requiring "foreign investors to invest half million to one million…dollars in qualified U.S. businesses to generate minimum ten NEW U.S. jobs." (*Id.* at 13.)  However, the program that Defendant Tang created was all a façade, since she presented fake pictures to potential investors for properties she did not own to entice them to come to the U.S.  (*Id.*)

At least one of these facts is not entirely "new"—for instance, the new fact concerning the immigration fraud was already pled in the operative complaint:

> [Defendants]…and other members of the family enterprise, aided and abetted each other, devised plans to profit from investment green card programs known as EB-5, which require foreign investors to invest half million to one million legitimate U.S. dollars in qualified U.S. businesses to produce minimum ten **NEW** U.S. jobs.

(ECF No. 33 ¶ 87.)  Nonetheless, the fact regarding the purchase of vehicles should be permitted in the amended complaint given that it indicates that Plaintiffs' monies were used for Defendants' personal use.  Finally, the last fact about the Summer Sands auction should only be allowed if the District Judge permits Plaintiff's derivative claim to move forward, as it will add context to Defendants' other related frauds, otherwise Plaintiffs should not be permitted to add this fact.  (*See* ECF No. 53-28) (conversations regarding motel auction dated December 1, 2023 which indicates a recent discovery by Plaintiffs).

Plaintiffs additionally seek to add two new causes of action—1962(a) and 1962(b).  "To state a claim for damages under RICO a plaintiff must allege (1) that the defendant (2) through the commission of two or more acts (3) constituting a pattern (4) of racketeering activity (5) directly or indirectly invested in, or maintained an interest in, or participated in (6) an enterprise (7) the activities of which affected interstate or foreign commerce."  *Grace Int'l Assembly of God v. Festa,* 797 Fed. Appx. 603, 604 (2d Cir. 2019) (cleaned up); *see also Grewal v. Cuneo*, No.

13-cv-6836 (RA), 2015 U.S. Dist. LEXIS 87755, at *47 (S.D.N.Y. July 7, 2015) (stating that all RICO claims require showing that defendant engaged in a pattern of racketeering activity).

To pass muster under § 1962(a), an investment claim must allege an injury stemming from the defendant's "use or investment of racketeering income in an enterprise." *Dornberger*, 961 F.Supp. at 525; *see also Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236, 245 (S.D.N.Y. 2003) ("[T]o have standing to bring a claim for civil damages under section 1962(a), a plaintiff must allege injury from defendants' investment of racketeering income in an enterprise." (internal quotation marks omitted)), *aff'd*, 80 F. App'x 722 (2d Cir. 2003) (summary order). That is, the racketeering activity generates income for the defendant, the defendant invests that income in an enterprise, and *that investment* harms the plaintiff. *Dornberger,* 961 F. Supp. at 525.

The undersigned has previously found that Plaintiffs satisfied the elements for their RICO claims and Defendant Tang's motion to dismiss should be denied.  In addition to those claims, Plaintiffs appear to allege a plausible RICO investment claim under § 1962(a).  The Third Amended Complaint alleges in sum and substance that Defendants used Plaintiffs' loaned monies to invest in properties and cars.  (*See* ECF No. 53-3.)  They also used the monies to purchase or sell various properties using the JLK LLC name.  (*Id*.)  As a result of Defendants' investments, Plaintiffs lost more than $1 million combined and Zou was cheated out of his JLK income.  The undersigned originally recommended denial of Plaintiff Zou's derivative claim, but if the District Judge finds that the derivative claim should go forward, the investment injury allegations surrounding JLK can be used to support a claim under 18 U.S.C. § 1962(a).

Likewise, Plaintiffs appear to state a cause of action under 18 U.S.C. § 1962(b).  This section states that individuals are prohibited from acquiring or maintaining an interest or control

84

of any enterprise through a collection of unlawful debt. 18 U.S.C. § 1962(b). "Unlawful debt" is described as debts incurred in connection with the business of lending monies. 18 U.S.C. § 1961(6)(B). As stated above *ad nauseam*, Plaintiffs allege that they lent monies to Defendants who unlawfully used it in various capacities to further their own interests. Thus, this claim should be added to the amended complaint.

Accordingly, both causes of action have been sufficiently pled and if an amendment is permitted, Plaintiffs should be allowed to include them.

## V.    CONCLUSION

For the foregoing reasons, the undersigned respectfully recommends that Defendants' motions to dismiss (ECF Nos. 54 and 55) be **GRANTED**:

1. As to Li's allegations of tax fraud and both Plaintiffs' claims of immigration fraud for lack of standing;
2. As to 18 U.S.C. § 1962(d) (Count Two);
3. As to Plaintiffs' state law claim for Breach of Contract/Promises (Count Four);
4. As to Plaintiffs' state law claim for Declaratory Judgment and Injunction (Count Eight);
5. As to Defendant Tang's motion to strike the diversity and punitive damages allegations; and
6. Defendant Han's motion to dismiss both the Second and Third Amended Complaints.

Conversely, Defendant Tang's motion to dismiss should be **DENIED**:

1. As to Plaintiffs' claims under subject matter jurisdiction (Fed. R. Civ. P. 12(b)(1));
2. As to Plaintiffs' state law claim for Common Law Fraud (Count Three);
3. As to Plaintiffs' state law claim for Conversion (Count Five);
4. As to Plaintiffs' state law claim for Unjust Enrichment (Count Six); and
5. As to Plaintiff's state law claim for Breach of Duty (Count Seven).

Finally, the undersigned recommends the following be **GRANTED IN PART AND DENIED IN PART** as to statute of limitations, and 18 U.S.C. § 1962(c) (Count One):

1. As to Plaintiff's derivative claims and the conflicts of interest, grant Defendant's motion as to the derivative claims but deny the motion as to the purported conflicts of interest.

2.    As to the statute of limitations, grant Defendant's motion as to expiration of the statute of limitations for the Summer Sands and Carousel Motels transactions and the immigration frauds, but deny it as to all other non-derivative transactions.

3.    As to Count One, grant dismissal of the following allegations: women baited Zou, Tang alleged an illness to get a tax filing extension, perjury, wires to and from China and to and from South Carolina, transference of 40% of shares in JLK, the Summer Sands sale, the immigration fraud, the currency reporting violations, extortion claims, fraud in connection with access devices, and obstructions of justice.

On the other hand, deny Defendants' motion to dismiss allegations of wire and mail fraud, money laundering, and transportation of stolen property. [18]

For Plaintiffs' Motion to Amend, the undersigned recommends:

1.    **GRANTING** as to adding the new fact about the vehicle and the new claims under 18 U.S.C. §§ 1962(a) and (b) (Counts One and Two).

2.    **DENYING** as to adding new facts about the auction and the immigration frauds.

If adopted, Plaintiffs should be directed to file on ECF the Third Amended Complaint consistent with and within ten (10) days of the Court's order.

## VI.    OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel. Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report.  28 U.S.C. § 636(b)(1) (2006 & Supp. 2011); Fed. R. Civ. P. 6(a), 72(b).  Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals. *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with

---

[18] *Herbert v. HSBC Mortg. Servs*., 13-CV-0322 (NGG) (RER), 2014 U.S. Dist. LEXIS 105192, at *31 (E.D.N.Y. June 30, 2014) (stating that plaintiffs that failure to claim an injury should not be given leave to replead).

the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604

(2d Cir. 2008) ("failure to object timely to a magistrate's report operates as a waiver of any

further judicial review of the magistrate's decision"); *see Monroe v. Hyundai of Manhattan &*

*Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (summary order) (same).

Dated:  Central Islip, New York.
        August 6, 2024

                    **RESPECTFULLY RECOMMENDED**,

                    /S/ *James M. Wicks*
                       JAMES M. WICKS
               United States Magistrate Judge